## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 2008-cv-01381-MSK-CBS

THE CASCADE FUND, LLLP,
on behalf of itself and a
class of similarly situated persons,

      Plaintiff,

v.

ABSOLUTE CAPITAL MANAGEMENT HOLDINGS LIMITED;
ABSOLUTE GENERAL PARTNER LIMITED;
FLORIAN HOMM;
SEAN EWING;
JOHN A. FLEMING;
RONALD E. TOMPKINS;
ULLRICH ANGERSBACH; and
ARGO GROUP LIMITED

      Defendants.

---

### PLAINTIFF'S OPPOSITION TO DEFENDANT ARGO GROUP LIMITED'S MOTION TO DISMISS

---

Plaintiff, The Cascade Fund, LLLP, respectfully submits this memorandum in opposition to Defendant Argo Group Limited's Motion to Dismiss the First Amended Complaint and Jury Demand ("Argo Group's Motion") (Dkt. No. 68, filed 9/16/2009).

### SUMMARY OF OPPOSITION

Defendant Argo Group Limited ("Argo Group") was spawned from whole cloth in 2008 for the sole purpose of absorbing and sheltering the vast majority of the assets of defendant

Absolute Capital Management Holdings, Inc. ("ACM").[1]  Those assets were threatened by ACM's disclosure, only months earlier, of a half-billion dollar fraud in U.S. penny stocks orchestrated by its own Florian Homm, which had precipitated dramatic losses of hundreds of millions of dollars to investors around the world (including the United States).[2]  Argo Group, as created in 2008, was owned by the exact same shareholders who owned ACM.

ACM's value plummeted by 80% immediately upon shuffling its assets to Argo Group and, according to ACM's own financial statements, created a risk that ACM "may not have enough resources to defend . . . claims [arising from Homm's fraud] or settle any successful claims which may arise."  Cascade, on behalf of a class of U.S. investors, thereafter sued the newly-created spinoff entity that received virtually all of the ACM assets that previously had been subject to the claims of defrauded investors.

Argo Group's Motion makes two primary arguments for dismissal – lack of personal jurisdiction (largely a factual issue) and lack of allegations sufficient to state a claim for successor liability (largely a pleading issue).  Both arguments, however, rely heavily on the same premise; *i.e.,* that Argo Group is insulated from the pre-spinoff conduct of its business confederates, ACM and Homm.  According to Argo Group, the fact that it was freshly-minted specifically to absorb virtually all of ACM's assets so that U.S. investors are left with nothing to recover from ACM presents a harsh reality that this Court is powerless to remedy.

Argo Group's Motion, however, fails even to address the proper jurisdictional issue.  In arguing that state law claims are not subject to nationwide service of process, Argo cites no case

---

[1] Absolute Capital Management Holdings, Inc., changed its name to ACMH Limited.  For ease of reference, Cascade will use ACM, as it has in all prior briefs.

[2] Homm disappeared immediately after disclosure of the fraud and remains in hiding.  ACM engaged two auditing firms to conduct internal investigations of Homm's trading activities (Ex. 6 at 115), but ACM never released the results of those investigations to the public and presumably will not until merits-based discovery begins.

in which the state law claim is for *successor liability*, or in which the movant was cloned from another defendant that *is* subject to nationwide service of process.  In fact, the overwhelming weight of authority confirms that a successor, like Argo Group, stands in the shoes of its predecessor (ACM) for purposes of personal jurisdiction in the United States.  Thus, Argo Group's lengthy discussion of its "contacts" with Colorado entirely misses the point.

Argo Group's Motion also contends that Cascade has failed to adequately plead successor liability.  Given the unique nature of personal jurisdiction in the context of successor liability, however, this pleading argument is largely governed and resolved by the jurisdictional analysis. In both cases, the compelling case of successor liability defeats the Argo Group's Motion.

## I.     ARGO GROUP IS SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES.

Argo Group first argues that it is not subject to personal jurisdiction in Colorado.

**Burden of Proof**

Cascade agrees that it bears the burden of establishing personal jurisdiction over Argo. In the initial stages of litigation, however, this burden is "light."  *Intercom, Inc. v. Bell Atlantic Internet Solutions*, 205 F.3d 1244, 1247 (10th Cir. 2000).  Where personal jurisdiction is determined based on the pleadings and supporting affidavits, the plaintiff need only present a prima facie showing of personal jurisdiction, *Wenz v. Memory Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995), and all factual disputes must be resolved in the plaintiff's favor.  *OMI Holdings, Inc. v. Royal Holdings Ins. Co. of Canada,* 149 F.3d 1086, 1091 (10th Cir. 1998).  If minimum contacts are shown, Argo Group has the burden of proving that the exercise of jurisdiction in the United States is not fair and reasonable.  *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000).

**Material Facts**

Argo Group did not exist until it was created in 2008 for the sole purpose of receiving ownership of ACM's most valuable assets while preserving the same ownership structure of ACM. Accordingly, the Material Facts for the jurisdictional analysis fall into two categories: (1) the United States contacts of ACM, from which Argo Group was cloned, and (2) the structure and effect of the spinoff by which ACM created, and then transferred virtually all of its assets to, Argo Group. The Material Facts regarding ACM's contacts with the United States are addressed in Cascade's opposition to ACM's motion to dismiss (Dkt. No. 51, filed 4/22/09) and are incorporated herein by reference.[3] The Material Facts regarding the creation of Argo Group and ACM's transfer of the Argo assets include the following:

1.      In January 2007, ACM acquired 100% of the shares of a number of investment management companies that ACM collectively referred to as "the Argo Division." Ex. 1 at 14 . The Argo Division emphasized investment management in the area of emerging markets. Ex. 1 at 5. ACM acquired the Argo Division's fund management expertise in emerging markets to complement its own purported expertise in equity markets. Ex. 2. ACM claimed a "successful integration" between ACM's investment management business and the Argo Division emerging market expertise while noting that "[t]he successful integration of Argo Capital Management, acquired in January 2007, added significant product diversification." Ex. 1 at 5, 7.

2.      ACM announced in September 2007 the "sudden and unexpected resignation of Florian Homm," who had been the Co-Chief Investment Officer of the ACM funds. Ex. 3.

---

[3] As noted in Cascade's opposition to ACM's motion to dismiss (Dkt. No. 51), nationwide service of process applies to Cascade's federal securities fraud claim, such that personal jurisdiction is premised on ACM's contacts with the United States, not merely its contacts with Colorado.

ACM further announced that Homm had purchased between $440-550 *million* of illiquid positions in companies "reported through the US-based Over the Counter Bulletin Board/Pink Sheets." Ex. 4; Ex. 7 at ARGO006. In response to virtually overnight requests for more than $100 million in redemptions, ACM suspended investors' ability to redeem fund shares. *Id.*

3.    Defendant Argo Group (not to be confused with the preexisting and similarly-named Argo Division, or the various "Argo"-titled fund management entities that comprised the Argo Division) was formed in February 2008. Ex. 5 at 37. At that time, Argo Group was "a wholly-owned subsidiary of Absolute Capital incorporated in the Isle of Man …" Ex. 6 at ARGO107.

4.    On April 29, 2008, ACM and its new subsidiary entered into a Sale Agreement whereby ACM transferred its entire share capital of its Argo Division companies to its newly-formed, wholly-owned subsidiary Argo Group in exchange for Argo Group's common stock. Ex. 5 at 217, ¶15.2; Ex. 6 at ARGO107.

5.    In May 2008, ACM agreed to distribute to its shareholders the common stock of the new Argo Group, which common stock ACM had received only days before when it transferred its Argo Division assets to the new entity. Ex. 5 at 217, ¶15.2; Ex. 6 at ARGO107. In this fashion, the newly created shares of Argo Group were distributed in-kind to the shareholders of ACM. Ex. 5 at 40, ¶8. (The creation of Argo Group, the transfer of ACM's Argo business to the new Argo Group in exchange for Argo Group's stock, and the subsequent distribution of Argo Group stock to ACM's shareholders is referred to hereafter as "the Argo Spinoff" or "the Spinoff.")

6.      Pursuant to the Argo Spinoff, ACM shareholders "received the same number of Ordinary Shares in Argo Group Limited" as they owned in ACM.  Ex. 7 at ARGO007.  Thus, Argo Group Limited was created "with the same shareholder base," allowing ACM's shareholders to "retain[] their existing holding of Ordinary Shares in ACM" and at the same time receive parallel ownership of Argo Group Limited.  Ex. 7 at ARGO007.  In other words, Argo Group ultimately became an entity that was owned independently, "albeit by the same shareholders in the same proportions as Absolute Capital."  Ex. 8.

7.      As part of the Spinoff, ACM agreed to provide "administrative and commercial services" to Argo Group even after the Spinoff.  Ex. 7 at ARGO89.  To facilitate those services, Argo Group committed to provide ACM "full and free access" to Argo Group's premises and to provide ACM management such office space and secretarial support as ACM may need.  Ex. 7 at ARGO090.  All the directors of the newly formed Argo Group were directors of ACM.  The "company secretary" of Argo Group fills the same position with ACM, and both ACM and Argo Group use the same "advisor and stockbroker."  Ex. 6 at ARGO0105-108.

8.      When ACM's shareholders approved of this device to segregate the Argo Division assets from ACM (but not from their collective ownership), ACM's stock price dropped by more than 60% in one day. Ex. 8.  The immediate post-Spinoff collapse of ACM's already battered stock price was perceived in the market as "a sign that [ACM]'s value lay mostly or wholly in the Argo fund management business and very little if at all in the battered original hedge fund activity."  Ex. 8.[4]

---

[4] Argo Group's Motion never challenges any of the factual allegations found in ¶¶59-68 of Plaintiff's First Amended Complaint regarding the structure, mechanics and effects of the Argo Spinoff in 2008.

9.      Like the market in general, ACM recognized that the Spinoff had transferred most or all of ACM's assets to Argo Group.  ACM issued financial statements for the period ended June 30, 2008 – barely two weeks after the Spinoff.  In connection with those financial statements, ACM's independent auditors, Deloitte & Touche, noted that in light of Homm's massive investments in illiquid American penny stocks, "adversely affected parties may consider and or commence litigation against" ACM.  Ex. 7 at ARGO015.  (In fact, Cascade had already filed this action.)  Nevertheless, ACM made "no provision for any liability that may ultimately arise …" Ex. 7 at ARGO015.

10.      To the contrary, since ACM had just transferred virtually all of its assets to Argo Group, Deloitte & Touche opined that the risk of successful litigation against ACM arising from Homm's investment activities "may cast significant doubt about [ACM's] ability to continue as a going concern."  Ex. 7 at ARGO015.

11.      In turn, ACM conceded in its financial statements that ACM "may not have adequate resources to defend these claims or settle any successful claims which may arise.  In such circumstances, *the company would cease to be a going concern."*  Ex. 7 at ARGO042 (emphasis added).

12.      Approximately six months after the Spinoff, Argo Group applied to have its shares traded publicly on the AIM exchange in London, England.  In its application, Argo Group specifically recognized and acknowledged that Argo Group "could become involved in disputes and/or claims, . . . arising out of its historic connection with Absolute Capital."  Ex. 5 at 26.

**Considering Materials Outside the Pleadings**

Cascade agrees with Argo Group that it is appropriate to consider materials outside the pleadings in resolving a motion to dismiss for lack of personal jurisdiction. *Davis v. U.S.,* 343 F.2d 1282, 1296 (10th Cir. 2003).

**Argument**

**A.    ACM AND ITS SHAREHOLDERS CANNOT CIRCUMVENT PERSONAL JURISDICTION BY CLONING A NEW ENTITY TO TAKE POSSESSION OF ACM'S ASSETS.**

**1.    The Personal Jurisdiction of a Predecessor Entity Is Imputed to Its Successor.**

Argo Group contends that Cascade's claim for successor liability is a state law claim, and that personal jurisdiction over state law claims against one defendant cannot rely on nationwide service of process applicable to the other defendant.  Ergo, contends Argo Group, the particular state law claim here *of successor liability* against Argo Group cannot rely on nationwide service of process available against ACM.  This superficially tempting syllogism, however, ignores a critical flaw:  successor liability, unlike any state law claim addressed in the cases relied on by Argo Group, is based on the relationship and transactions *between the two defendants*.  Here, the claim against Argo Group derives from the fact that Argo Group was cloned from, and is the successor to, ACM.  Argo Group cites no case for the proposition that a defendant sued for *successor liability* is automatically cleansed of the jurisdictional contacts of its progenitor.

The only case cited by Argo Group for its counterintuitive notion of legal ablution is *Gill v. Three Dimension Systems, Inc*., 87 F. Supp. 2d 1278, 1283-84 (M.D. Fla. 2000), where the plaintiff asserted federal claims against certain defendants and state law claims against two other individuals for breach of contract, fraudulent inducement, and corporate mismanagement.  There

8

was no claim for successor liability against the individuals and, as individuals, these defendants

obviously had not been created solely to receive assets of the primary defendants.[5]

Many courts have rejected the exact jurisdictional argument raised by Argo Group

because a successor, virtually by definition, stands in the jurisdictional shoes of its predecessor.

Indeed, "the jurisdictional contacts of a predecessor corporation [are imputed] to its successor

corporation …." *Patin v. Thoroughbred Power Boats, Inc*., 294 F.3d 640, 653 (5th Cir. 2002)

(and cases cited therein). Thus,

> federal courts have consistently acknowledged that it is compatible with due
> process for a court to exercise personal jurisdiction over an individual or
> corporation that would not ordinarily be subject to personal jurisdiction in that
> court when the individual or corporation is an alter ego *or successor* of a
> corporation that would be subject to personal jurisdiction in that court. *Id.*
> (emphasis added).

In short, "the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the

purposes of the *International Shoe* due process analysis." *Id*. (emphasis in original).

Based on an exhaustive review of federal and state cases, the court in *Simmers v.*

*American Cyanimid Corp.,* 576 A.2d 376 (Pa. Super. 1990), found that "the great weight of

persuasive authority permits imputation of a predecessor's actions upon its successor *whenever*

forum law would hold the successor liable for its predecessor's actions …." *Id*. at 385 (emphasis

in original). Any other result would reward corporate gamesmanship of transferring assets to

evade personal jurisdiction:

> Plaintiff must be permitted to establish jurisdiction over a successor corporation
> based upon its predecessor's contacts with the forum. Otherwise, a corporation
> which voluntarily or by the operation of law assumes its predecessor's liabilities

---

[5] Argo Group's other citations add no further support. *Morley v. Cohen*, 610 F. Supp. 798, 823 (D.Md. 1985) did
not involve successor liability or a fraudulent transfer of assets. *Winer Family Trust v. Queen*, 503 F.3d 319, 338
(3d Cir. 2007) does not involve personal jurisdiction at all, and the cited secondary source, 69 Am.Jur.2d Securities
Reg.-Federal §282, itself cites only to *Gill*.

> may be able to avoid the jurisdiction of the very forum where the liability accrued simply because it never did business within that state.  This result would be absurd, especially when … the successor no doubt had knowledge of the predecessor's presence within the forum.  *Id*. at 389-90.

Many other courts have emphasized that a transfer of assets to a successor cannot be allowed to circumvent personal jurisdiction over the successor.  *See, e.g., Duris v. Frato Shipping*, 684 F.2d 352, 356 (6th Cir. 1982) ("Any other ruling would allow corporations to immunize themselves by formalistically changing their titles"); *Huth v. Hillsboro Ins. Mgmt.,* 72 F. Supp. 2d 506, 511 n.4 (E.D. Pa. 1999) (quoting *Simmers*); *cf. Minnesota Mining & Mfg. Co. v. Ecochem, Inc.,* (if successor in interest subject to Rule 25(c) motion were not subject to imputed personal jurisdiction of its predecessor, "the owners of the property could merely transfer legal ownership of the assets from one shell corporation to another in a different jurisdiction, putting a party whose initial suit satisfied the jurisdictional requirements to the immense burden of chasing the involved assets from courtroom to courtroom").

Considering these authorities, Argo Group's jurisdictional argument wholly misses the point.  Instead of addressing "the great weight of persuasive authority" that bases jurisdiction over a successor on the jurisdictional contacts of the predecessor (*i.e*., ACM), Argo Group focuses almost exclusively upon the extent of its *own* jurisdictional contacts with the forum.  Argo Group's Motion at 4-16.  One easily understands why Argo Group mistakenly narrows the inquiry to focus on its own contacts with the forum; after all, a cloned entity first formed in 2008 – *after* ACM's undisclosed purchases of hundreds of millions of dollars of U.S. penny stocks through Homm's Hunter World Markets brokerage firm in California were completed and then later revealed – is unlikely to carry its own passel of contacts with the underlying fraudulent activity.  As so many courts have held, however, this litigious feint evades the true jurisdictional

inquiry in which the contacts of the predecessor are as probative of personal jurisdiction as those

of the successor itself.

> **2.**     **There Is a Prima Facie Showing of Successor Liability Sufficient to Establish Personal Jurisdiction Over Argo Group.**

To establish personal jurisdiction over Argo Group, Cascade "need only make a prima

facie showing" of Argo Group's liability as a successor to ACM.  *See United States v. Bliss,* 108

F.R.D. 127, 133 n.2 (W.D. Mo. 1985).  Thus, to a degree,

> a finding of jurisdiction turns on the resolution of a substantive issue.  In recognition of that, at such an early stage in a case, a plaintiff should not be expected to prove such facts with the same degree of certainty required on a summary judgment motion or at a trial, the *prima facie* burden is satisfied if the documents submitted demonstrate facts sufficient to support a finding of jurisdiction.  *Huth*, 72 F. Supp.2d at 511 (internal citations and quotations omitted).

*Accord, Simmers,* 576 A.2d at 386 n.11 (court will "make the preliminary determination of

whether, based on the facts as they have been developed at this early stage of litigation, the

successor corporations should stand in the shoes of their predecessors").  Argo Group is subject

to personal jurisdiction here because, even at this early stage, there is a strong prima facie case of

successor liability.[6]

Argo Group's Motion at 21 correctly identifies several ways to establish a successor

relationship between an entity and the transferee of its assets.  As Argo Group concedes, it can

be liable for ACM's fraud if (1) there is an express or implied assumption of liability; (2) the

---

[6] Cascade agrees with Argo Group that <u>if</u> ACM is not subject to personal jurisdiction in Colorado, then the Argo Group's successor liability would not subject it to personal jurisdiction in Colorado either.  However, for all the reasons stated in Plaintiff's Opposition to the ACM Defendants' Motion to Dismiss the First Amended Complaint, including nationwide service of process over ACM, ACM's massive contacts with the U.S and even ACM's contacts directly with Colorado, Cascade believes personal jurisdiction over ACM in this Court is manifest. Accordingly, Argo is likewise subject to jurisdiction here as long as Cascade can make a preliminary showing of successor liability.

transaction results in a *de facto* merger or consolidation of the two corporations; (3) the purchaser is a mere continuation of the seller; or (4) the transfer is for fraudulent purposes.  In addition, "[r]ecent cases have found the absence of adequate consideration for the sale or transfer to be a new, fifth exception to the rule of non-liability."  *Successor Liability in Asset Acquisitions*, 1611 PLI/Corp 125, 135 (June-July 2007).  Using these examples as the appropriate frame of reference, it is apparent that Cascade satisfies the prima facie standard in a number of ways.

      **a.**    **Fraudulent Transfer** – A compelling basis for successor liability is the factual reality that the Argo Group Spinoff was consummated for the fraudulent purpose of shielding ACM's only meaningful assets from defrauded investors.  "In essence, it is simply an application of the general rule against fraudulent conveyances."  *Successor Liability*, *id*. at 135.

      Even at this early stage, the evidence of fraudulent transfer is compelling:

      1)    Argo Group was sired for the sole purpose of acquiring the vast majority of ACM's assets.

      2)    The transfer was structured to preserve continuity of ownership of the Argo Division assets, such that ACM's shareholders would own Argo Group in the same proportions as they owned ACM.  Thus, ACM's shareholders preserved their interest in ACM's assets through their ownership of Argo Group while shielding those same assets from the victims of ACM's fraud.  Ex. 7 at ARGO007.

      3)    As an added effort devoted to removing assets from the reach of defrauded investors, ACM and Argo Group agreed from the outset that ACM's stock in the newly formed Argo Group would immediately be distributed to ACM's shareholders in direct proportion to

their ownership of ACM.  Thus, ACM – facing enormous exposure for the Homm/Hunter World

Markets fraud described in Cascade's First Amended Complaint – dispensed with both its only

material assets (the Argo Division) *and* the stock it nominally received for those assets, while

preserving its shareholders' ownership of those assets.

     4)     Argo Group "paid" for ACM's assets with its own newly created stock, stock that

had no inherent value of its own because "Argo Group Limited had no assets, revenues or lines

of business before the Argo Group" spinoff.  Ex. 10 at Response to Interrogatory No. 2.  Thus,

the consideration for ACM's assets was illusory and circular.

     5)     ACM and Argo Group knew full well that "adversely affected parties may

consider and or commence litigation against" ACM (Ex. 7 at ARGO015) and against Argo

Group (Ex. 5 at 26).

     6)     As ACM has admitted, the transfer had the effect of cutting off those adversely

affected investors' claims by leaving ACM unable to pay claimants, including Cascade and the

other members of the class, defrauded by the Homm/Hunter World Markets scheme.  Indeed,

post-Spinoff, ACM bluntly conceded that it could not pay successful claims and would simply

cease to be a going concern if it incurred liability for its fraud.  Ex. 7 at ARGO015 and 042.

     Successor liability has been imposed on other corporations that engaged in just such

corporate restructuring machinations to shield their assets.  In *Schmoll v. Acands, Inc*., 703

F. Supp. 868 (D.Or. 1988), Raymark Industries attempted to evade significant asbestos-related

liability by creating new Raymark subsidiaries owned by the same shareholders, and by

transferring Raymark Industries' valuable assets to the new entity.  Raymark Industries then

argued that its creditors "will no longer have access to Raymark Industries' valuable assets or to

the potential stream of profits generated by those assets." *Schmoll*, 703 F. Supp. at 873. The court disagreed, and instead imposed successor liability on the new entity because the corporate reorganization and the transfer of profitable corporate assets were designed with the improper purpose of escaping liabilities. *Id*. at 874. *See also Raytech Corporation v. White*, 54 F.3d 187, 194 (3d Cir. 1995) (discussing same transaction and noting with disapproval that "Raytech was entirely owned by the former shareholders of Raymark Industries, so that the exact same shareholders who once owned a company … possessing both profitable assets and staggering asbestos liabilities, now owned a company … possessing profitable assets and no asbestos liability"). The facts compel the exact same conclusion here.

Similarly, in *Eagle Pacific Ins. Co. v. Christensen Motor Yacht Corp.,* 959 P.2d 1052, 1059 (Wash. 1998), the court discussed numerous cases in which successor liability was imposed under facts showing an identify of parties behind the transferor and transferee entities, noting that "common ownership of the buying and selling corporations casts a suspicion on the transactions." *See also Chicago Truck Drivers, etc. Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 51 (7th Cir. 1995) ("the acquisition of Old Tasemkin by New Tasemkin … clearly had the effect, intended or no, of frustrating unsecured creditors while resurrecting virtually the identical enterprise"). Generally, successor liability premised on a fraudulent transfer turns on such factors as "the sufficiency of the consideration given for the sale, the insufficient assets of the selling company [and] intent by either the purchaser or the seller to construct the sale solely to

avoid" liability. *Ferguson v. Arcata Redwood Co.,* 2004 WL 2600471 at *5 (N.D. Cal. Nov. 12, 2004).[7]

Admittedly, it would be more difficult for a plaintiff to show a fraudulent transfer where the purchaser is an independent, pre-existing entity that buys assets for legitimate consideration; indeed, the rationale for the general rule against imposing successor liability in traditional asset transfers is that a "bona fide purchaser who gives adequate consideration and who lacks notice of prior claims against the property acquires no liability for those claims." *Eagle Pacific*, 959 P.2d at 1055. The Argo Spinoff, however, never involved a bona fide purchaser (it involved a newly created, special purpose entity with identical ownership), never embraced adequate consideration (the profitable Argo Division assets were "paid for" with stock in the new entity having no intrinsic value), and was consummated by the perpetrators with full knowledge of existing legal exposure (both ACM and Argo Group conceded in the transactional documents that they might be sued for ACM's prior actions). Ex. 5 at 26; Ex. 7 at ARGO015, ARGO042.

Again, at this juncture Cascade need not *prove* Argo Group's successor liability – Cascade need only make a preliminary showing in that regard. In *DC Aviation, LLC v. Avbase Flight Services, LLC*, 2008 WL 373175 at *7 (D. Colo. Feb. 8, 2008), the successor corporation was subject to personal jurisdiction in Colorado because the court found plaintiff's allegations of fraudulent transfer were "sufficient to establish a reasonable inference" of successor liability. Cascade respectfully suggests that the allegations in the First Amended Complaint, supplemented

[7] Although Argo Group cites *Ferguson v. Arcata Redwood Co.* as support for dismissing Cascade's successor liability claim, the plaintiff in *Ferguson* offered no factual support whatsoever for her successor liability allegations and failed to address the issue at all in her briefing. *Ferguson v. Arcata Redwood Co.,* 2004 WL 2600471 at *5 (N.D. Cal. Nov. 12, 2004). Here, Cascade specifically alleges successor liability predicated upon a fraudulent purpose, and supports the claim with factual allegations describing the fraud. First Amended Complaint ('FAC') ¶¶59-68, 102.

by the facts revealed in jurisdictional discovery, likewise demonstrate a "reasonable inference"

of successor liability based on fraudulent transfer, which, in turn, is sufficient to establish

personal jurisdiction over Argo Group.

      **b.**      **Mere continuation and *de facto* merger** –  The imposition of successor

liability on the theory of "mere continuation," or its closely related analytical cousin *de facto*

merger, exist separately from allegations of fraudulent purpose and look principally to the

continuity of ownership between ACM and Argo Group.  As one federal court has noted:

> The 'mere continuation' and 'de facto merger' exceptions originated in cases
> where the seller's shareholders retained their interest in the transferred assets
> through an ownership interest in the purchasing corporation, while freeing the
> assets from the claims of the seller's creditors by disguising the transaction as an
> asset sale.  In such cases, the courts determined that the form of the transaction
> did not accurately portray its substance, and they imposed successor liability upon
> the purchaser.

*Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp.2d 86, 94-95 (S.D. N.Y. 2002).  Similarly, in

*CMCB Enterprises, Inc. v. Ferguson,* 114 P.3d 90, 93-94 (Colo. App. 2005), the Colorado Court

of Appeals, looking to substance over form, found a successor corporation to be a "mere

continuation" of its predecessor when the two corporations had the same officers, directors, and

shareholders, conducted the same business operations, and inadequate assets were left in the old

corporation to pay its debts and liabilities.  *See also Baca v. Depot Sales, LLC,* 2007 WL 988061,

*3 (D. Colo. March 30, 2001) (the test for the applicability of this exception is whether the

purchasing corporation is, in effect, a continuation of the seller's business operation).

      Here, the governing documents for the Argo Spinoff disclose that all the directors of the

newly formed Argo Group Limited were directors of ACM; the "company secretary" of Argo

Group fills the same position with ACM; both ACM and Argo Group use the same "advisor and

stockbroker;" and, although the Spinoff will ostensibly produce "separate ownership" for ACM

and Argo Group, that ownership was formed "[with] the same shareholder base."  Ex. 6 at

ARGO0105-108.[8]  To emphasize the point of continuity, ACM and Argo Group even arranged

for ACM to provide administrative and commercial services to Argo Group, to have offices and

secretarial support in Argo Group's offices to assist in providing those services, and to have "full

and free access" to Argo Group's premises.  Ex. 7 at ARGO089-90.  Moreover, as conceded in

the "Notice of Extraordinary General Meeting" that ACM distributed to consummate the

Spinoff, "as a result of the events of September 2007 [*i.e.,* the disclosure of the ACM/Homm

trading fraud], the Board believes that its previous strategy of combining the two operations [of

ACM and Argo] is no longer in Shareholders' best interests, and the value of both the Argo

Business and Absolute Capital's business to Shareholders would be improved through the

Distribution."  *Id.* at ARGO0108.

     "Distribution" is the euphemism used by ACM to describe the Spinoff and, in the

Extraordinary Notice, the "Distribution" is described as "the proposed distribution of the Argo

Business from Absolute Capital by way of a distribution of capital."  Ex. 6 at ARGO0103.  Thus,

there was no change in the continuity of management, the personnel, the directors, the

shareholders, or the general business operations as conducted by "combining the two

operations;" there was simply a newly configured "distribution of capital" between and among

"the same shareholder base."  Ex. 6 at ARGO0105-108.

---

[8] In fact, the Distribution Agreement that consummated the Argo Spinoff was signed (i) on behalf of ACM by Glenn
Kennedy, an ACM director who also serves as Argo Group's corporate secretary, and (ii) on behalf of Argo Group
by Michael Kloter, who is a director of both ACM and Argo Group.  Ex. 8 at ARGO0097.

The key to the inquiry here is the fact that the Argo Spinoff was carefully constructed to allow ACM's "shareholders to retain the benefits of their ownership interest [in the Argo Division] while leaving creditors without a remedy." *National Gypsum Co. v. Continental Brands Corp.*, 895 F. Supp. 328, 337-338 (D. Mass. 1995). The circular Spinoff *alone* was not enough to shield the assets, however, because ACM still could have satisfied defrauded investors with "the consideration it received" in the Spinoff, *i.e,* the stock of the Argo Group that then owned all the valuable assets. By immediately distributing that stock to ACM's shareholders, however, the shareholders implemented their attempt to have their cake and eat it too – they retained ownership of the valuable Argo Division assets, yet left ACM judgment-proof.

Argo Group argues that it cannot incur successor liability – despite the transparently suspicious circumstances of the Spinoff – because ACM has not formally dissolved and thus there is more than "a single corporate entity after the transaction at issue." Argo Group's Motion at 22. But courts have imposed "continuation" and "*de facto* merger" successor liability even where the selling corporation does not dissolve. *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1974). Moreover, "the fact that the *entirety* of the predecessor's assets were not transferred to the successor does not render the mere continuation exception inapplicable." *Patin v. Thoroughbred Power Boats, Inc.,* 294 F.3d 640, 651 (5th Cir. 2002). *Accord* Rest. (Third) of Torts: Products Liability §12, cmt. h (1998) ("there is no reason that the [merger and continuation] exceptions . . . might not arise in connection with the transfer of a division of a large company, leaving the company in existence after the transfer. And the [fraudulent transfer] exception . . . could arise in connection with transfers involving less than all of the predecessor's assets where the predecessor continues in existence after the transfer").

Numerous courts have held that no single factor is determinative and that not every element (including the typical dissolution of the transferor) need be satisfied in order to find that the successor is a "mere continuation" of the predecessor, or that a *de facto* merger has occurred. Indeed, some courts have held that if there is a key or essential element to showing continuation or *de facto* merger, continuity of ownership is that key element. *See Cargo Partner*, 207 F. Supp.2d at 99-100; *CMCB Enterprises*, 114 P.2d at 94. There can be no greater continuity of ownership than the exact, share-for-share ownership by which ACM cloned Argo Group.

Argo Group is a "mere continuation" of ACM or, viewed alternatively, is the intended product of the *de facto* merger of Argo Group and ACM. As such, Cascade has adequately pled its claim of successor liability against Argo Group and, accordingly, this Court has personal jurisdiction over Argo Group, just as it does over ACM.

> **3.    Foreign Law Poses No Impediment to a Judgment Predicated Upon this Court's Exercise of Personal Jurisdiction Over Argo Group.**

In a curious argument nestled among its objections to this Court's exercise of personal jurisdiction, Argo Group claims that "any judgment entered by this Court in favor of Plaintiff is unenforceable in the Isle of Man." Argo Group's Motion at 17. Argo Group relies solely on Colorado counsel's interpretation of Isle of Man statutes for the argument that the Isle of Man would not honor a judgment from a United States federal court. Argo Group does not cite to expert testimony or to any case law interpreting the law of the Isle of Man. *Cf. Inter Medical Supplies Ltd. v. EBI Medical Systems, Inc.,* 181 F.3d 446, 459 (3d. Cir. 1999) ("Expert testimony is the most common way to determine foreign law …") (internal citations and quotations omitted). Regardless, Argo Group's conclusion is simply incorrect.

Attached as Exhibit 11 is the Joint Opinion of Paul Lowenstein, a barrister appointed Queen's Counsel and licensed to practice law in England and Wales, and Seth Caine, a director of a leading law firm based in Douglas, Isle of Man.  Ex. 11 at 1-2.[9]  Cascade sought from these respected practitioners their opinion regarding the precise premise of part I.E.3 of Argo Group's Motion, to wit: "a judgment based on this Court's exercise of personal jurisdiction in Colorado cannot be enforced against Argo in the Isle of Man."  Argo Group's Motion at 17.  In rejecting Argo Group's contention, the Joint Opinion includes this "Summary of advice:"

7       In summary, for the reasons set out below at paragraphs 8 to 28, our advice is as follows:

7.1     that Argo is in error to assert as it does in the Motion that the 1979 Act would govern the enforcement of a Colorado judgment in the courts of the Isle of Man

7.2     that since the 1979 Act is of no application, the 1933 Act does not apply

7.3     that, therefore, the arguments advanced by Argo in the Motion as to the restrictions that it says would be imposed upon the enforcement of a Colorado judgment in the courts of the Isle of Man are equally erroneous

7.4     that the Isle of Man statute equivalent to the 1933 Act equally does not apply

7.5     that the result is that Argo is incorrect to argue that the Isle of Man statutes would operate to bar the enforcement of the Colorado judgment in that jurisdiction

7.6     that the applicable source of law both in the Isle of Man and in England is the English Common Law

7.7     that well established rules govern the recognition and enforcement of United States judgments at Common Law in England and, by extension, in the Isle of Man

7.8     that so long as any judgment obtained in the Colorado Courts complies with the Common Law rules, the Plaintiffs will be entitled to seek to have it recognised and then enforced in the Isle of Man and/or in England by commencing a fresh local action on the judgment.  There are very limited defences to such actions, which ordinarily proceed rapidly to summary judgment.

---

[9] As noted earlier, Cascade agrees with Argo Group that it is appropriate to consider materials outside the pleadings in resolving a motion to dismiss for lack of personal jurisdiction.  Since Argo Group's argument regarding enforcement of judgments in the Isle of Man is raised as part of its objection to the exercise of personal jurisdiction, the Joint Opinion is properly considered in resolving that argument.  *See also Inter Medical Supplies, supra.*

Ex. 11 at 5-6.

The Joint Opinion's conclusions are sufficient to dispense with Argo Group's contention that Cascade must search for another forum in which to seek a judgment enforceable in the Isle of Man.  As noted in the "Summary of advice," Argo Group's reading of the Isle of Man Act of 1979 is "in error" and "the arguments advanced by Argo in the Motion as to the restrictions that it says would be imposed upon the enforcement of a Colorado judgment in the courts of the Isle of Man are equally erroneous."  *Id.*  Thus, Argo Group's flawed reading of the Isle of Man Act of 1979 cannot defeat this Court's exercise of personal jurisdiction.

## II.  CASCADE'S FIRST AMENDED COMPLAINT ADEQUATELY PLEADS A CLAIM FOR SUCCESSOR LIABLITY AGAINST ARGO GROUP.

Argo Group argues that Cascade has not adequately pled its claim of successor liability.

**Burden of Proof**

While Cascade bears the burden of establishing the elements of its successor liability claim, the Court should accept the material allegations of the First Amended Complaint as true and should construe all of those allegations in the light most favorable to Cascade, the nonmoving party.  *City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1257 (10th Cir. 2001); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("court must . . . accept all factual allegations in the complaint as true").  Generally speaking, a complaint requires "only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]."  *Id.* at 570.

**Elements of Cascade's Successor Liability Claim**

Cascade agrees with Argo Group's recitation of the standards for when a successor

corporation can be held liable for the acts or omissions of its predecessor.  Argo Group Motion at

20-21.  Contrary to Argo Group's protests, however, the First Amended Complaint pleads a

claim of successor liability against Argo Group based upon the fraudulent transfer basis and the

"mere continuation" or *de facto* merger basis.  Moreover, Cascade's successor liability claim

must satisfy only the liberal pleading standards of Fed. R. Civ. P. 8.

**Argument**

**A.    CASCADE'S FIRST AMENDED COMPLAINT SUFFICIENTLY PLEADS
A CLAIM AGAINST ARGO GROUP FOR SUCCESSOR LIABILITY.**

**1.    Cascade's Successor Liability Claim Meets the Pleading Standards of the
Federal Rules of Civil Procedure.**

Argo Group says that the claim of successor liability found in the First Amended

Complaint is inadequately pled, but its arguments insist upon a level of factual detail that simply

is not required at the pleading stage.

Courts consistently recognize that claims of successor liability are satisfied by general

allegations pled consistently with Rule 8 of the Federal Rules of Civil Procedure.  *Chao v.

Concrete Management Resources, L.L.C.,* 2009 WL 564381, * 2 (D. Kan. March 5, 2009)

(finding successor liability claim governed by Rule 8 standards while stating, *inter alia,* that "[t]o

the extent [defendant] suggests that successor liability claims are subject to a heightened

pleading standard, it directs the court to no authority supporting that argument and, indeed, the

vast majority of cases have held that such claims are not subject to a heightened pleading

requirement"); *Retirement Plan of the Unite Here Nat'l Retirement Fund v. Kim,* 2009

22

WL 413077, *2  n. 1 (N.D. Ill. Feb. 17, 2009) (successor liability claims "are not subject to

Rule 9"); *Premier Pork L.L.C. v. Westin, Inc.,* 2008 WL 724352, *4 (D. N.J. March 17, 2008)

("In the few cases where courts have reviewed the factual allegations upon which successor

liability is premised, they have done so under the liberal notice pleading standards of Rule 8(a),

even where the plaintiff bases its successorship claim on a fraudulent transfer theory."); *Kuhns*

*Bros., Inc. v. Fushi Int'l, Inc.,* 2007 WL 2071622, *4 (D. Conn. July 16, 2007) (plaintiff need not

plead specific facts to establish any of the factors pertinent to a finding of successor liability;

bare allegation that defendant is a successor in interest is sufficient to satisfy Rule 8); *Adani*

*Exports Ltd. v. Amci (Export) Corp.,* 2006 WL 1785707, *2-*3 (W.D. Pa. June 26, 2006) (citing

*Simmers* and denying motion to dismiss successor liability claim without applying any

heightened pleading standard); *Kruse v. Aamed, Inc.,* 1997 WL 102528, *4 (N.D. Ill. March 4,

1997) ("Rule 9(b) does not apply to claims for successor liability").

  Considering this well-established case law, to survive Argo Group's pleading challenge

the First Amended Complaint need only "describe the claim in sufficient detail to give the

defendant 'fair notice of what the claim is and the grounds upon which it rests' and the factual

allegations must plausibly suggest that the plaintiffs have a right to relief, raising that possibility

above a 'speculative level.'"  *Chao*, 2009 WL 564381 at *2 (quoting *Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544).  The pleading of a successor liability claim need not contain specific

facts or go beyond the notice pleading requirements of Rule 8.  *Premier Pork L.L.C. v. Westin,*

*supra; Kuhns Bros., supra.*  Here, the First Amended Complaint amply conforms with those

requirements.

The First Amended Complaint alleges the following:  that "Argo Group was formed for the sole purpose of divesting ACM of its most valuable remaining assets" (FAC ¶61); that "[a]fter the September 2007 disclosure [of Homm's fraudulent penny stock scheme] … ACM and Argo Group entered into an agreement under which ACM transferred its ownership of Argo Capital and the related Argo entities to the new entity, Argo Group, [and] [i]n return ACM received stock in Argo Group" (*Id.*); that, "ACM agreed to pay a dividend to its shareholders consisting of ACM's stock in the new Argo Group entity" so that "[t]ogether, these transactions [constitute] the Argo Spinoff" (FAC ¶62); that "[t]he intent behind, and the consequence of, the Argo Spinoff was to shield ACM's largest asset from the exposure ACM faced as a result of the fraudulent penny stock scheme" (FAC ¶63); that "[t]he Argo Spinoff altered the form of ownership of Argo Capital and the related Argo entities, but not its substance" (FAC ¶64); that "ACM and Argo Group knew that the Argo Spinoff would dramatically remove value from ACM and transfer that value to Argo Group" (FAC ¶65); that "ACM and Argo Group were fully aware that investors in the Absolute Capital Funds would see the Argo Spinoff for what it is – an attempt to shield ACM's biggest asset from the claims of investors who were defrauded by ACM" (FAC ¶66); and that "Argo Group is the successor in liability to ACM" (FAC ¶67).

All of these factual allegations are then aggregated in a claim for successor liability that alleges, *inter alia,* "The Argo Spinoff resulted in a new entity, Argo Group Limited, that was merely a continuation of the debt and real estate fund business of ACM.  The same persons responsible for ACM's debt and real estate fund management before the Argo Spinoff continued to manage the debt and real estate funds after the Spinoff, for the benefit of the exact same shareholders of ACM who had become shareholders of Argo Group."  FAC ¶101.  This is

followed by: "The Argo Spinoff was [a] fraudulent diversion of ACM's most valuable assets to shield those assets from ACM's liability for fraud based upon the fraudulent penny stock investment scheme described herein." *Id.* at ¶102. In sum, the First Amended Complaint includes specific factual allegations supporting its claim for the imposition of liability under the mere continuation, *de facto* merger, and fraudulent transfer standards of successor liability. There is no question that Argo Group has fair notice of Cascade's successor liability claim and the grounds on which it is based.

Argo Group's insistence that Cascade's claim of successor liability, insofar as predicated upon a "fraudulent purpose," must satisfy the heightened pleading standards of Rule 9(b) is incorrect. As recited above, the great weight of authority has consistently held that successor liability claims "are not subject to Rule 9." *Retirement Plan of the Unite Here Nat'l Retirement Fund, supra; see also Premier Pork L.L.C., supra*, 2008 WL 724352, *4; *Kruse v. Aamed, Inc., supra.* Moreover, even if Rule 9(b) were considered pertinent, this Court has concluded that, as applied in the context of a successor liability claim predicated upon a "fraudulent purpose" theory of liability, Rule 9 requires only the pleading of facts sufficient to establish "a reasonable inference" of liability. *DC Aviation, LLC v. Avbase Flight Services, LLC*, 2008 WL 373175 at *7. The First Amended Complaint fully satisfies that standard.[10]

---

[10] Argo Group cites *JSB Industries, Inc. v. Nexus Payroll Services, Inc.,* 463 F. Supp.2d 103 (D. Mass. 2006) and *Ferguson v. Arcata Redwood Co., LLC,* 2004 WL 2600471 (N.D. Cal. 2004) as support for its argument that Rule 9(b) requires dismissal of Cascade's successor liability claim. These cases are readily distinguishable. In *JSB Industries,* the court found the claim unsupported by sufficient facts while specifically noting the absence of any allegation that the transaction price was unreasonable or that the sale was prompted by an effort to escape liability. *Id.* at 110-111. No such shortcomings exist here where the First Amended Complaint describes the circularity of the Argo Spinoff and specifically alleges that the "[t]he intent behind, and the consequence of, the Argo Spinoff was to shield ACM's largest asset from the exposure ACM faced as a result of the fraudulent penny stock scheme." FAC ¶¶62-64. Further, as noted earlier, the plaintiff in *Ferguson v. Arcata Redwood Co.* offered no factual support whatsoever for her successor liability allegations and failed to address the issue at all in her briefing. *Ferguson v.*

     2.       **Cascade's Claim for Securities Fraud Against ACM is Sufficiently Pled and Argo Group is Liable for Securities Fraud Under Cascade's Successor Liability Claim.**

For all the reasons set forth in Plaintiff's Opposition to the ACM Defendants' Motion to Dismiss the First Amended Complaint (Dkt. No. 51) which is incorporated by reference herein, Cascade submits that it has sufficiently pled its claim for securities fraud under § 10(b) and § 20(a) of the Securities and Exchange Act against the ACM Defendants. Argo Group is equally liable for these securities fraud claims under Cascade's well-pled claim of successor liability.

**III.     CONCLUSION.**

For all the reasons stated herein, and those set forth in Plaintiff's Opposition to the ACM Defendants' Motion to Dismiss the First Amended Complaint, Cascade respectfully submits that Argo Group's Motion should be denied.

Dated: February 11, 2010.

Respectfully submitted,

**SANDER INGEBRETSEN & WAKE, P.C.**

By: s/Daniel F. Wake
    1660 17th Street, Suite 450
    Denver, CO 80202
    Telephone: 303-285-5544
    Facsimile: 303-285-5301
    dwake@siwlegal.com

---

*Arcata Redwood Co.*, 2004 WL 2600471 at *5. Here, Cascade specifically alleges successor liability predicated upon a fraudulent purpose, and supports the claim with factual allegations describing the fraud. FAC ¶¶59-68, 102.

George W. Croner
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone:  215-238-1700
Facsimile:  215-238-1968
gcroner@kohnswift.com

Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2010, I electronically filed the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT ARGO GROUP LIMITED'S MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

> Amy L. Benson - abenson@bhfs.com
> John V. McDermott - jmcdermott@bhfs.com
> Meghan Frei Berglind - mberglind@bhfs.com
> Brownstein Hyatt Farber Schreck, LLP
> 410 17th Street, #2200
> Denver, CO 80202-4437
>
> Matthew J. Smith - Matt.Smith@huschblackwell.com
> Husch Blackwell Sanders LLP
> 1700 Lincoln, Suite 4700
> Denver, CO  80203

s/ Patty Bates