## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01381-MSK-CBS

THE CASCADE FUND, LLLP, and
on behalf of itself and a
class of similarly situated persons,

      Plaintiff,

v.

ACMH LIMITED (f/k/a ABSOLUTE CAPITAL MANAGEMENT HOLDINGS LIMITED);
FLORIAN HOMM;
SEAN EWING;
ULLRICH ANGERSBACH, and
ARGO GROUP LIMITED

      Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, The Cascade Fund, LLLP, through its attorneys, Sander Ingebretsen & Wake, P.C., and Kohn, Swift & Graf, P.C., on behalf of itself and all others similarly situated states as follows:

### OVERVIEW

This action arises from what Defendant ACM, itself, recently labeled as a "brazen criminal fraud" of its own executive officers and corporate agents, and for which ACM is liable to Plaintiff and the members of the Class.  ACM's description arose in the context of a lawsuit in which it recently caused the hedge funds it managed and controlled through exclusive stock ownership to publicly concede that the **exact** transactions upon which Cascade first based its securities fraud claims nearly two years ago were the product of "an elaborate scheme to

defraud" involving "next-to-worthless securities" that were "grossly inflated" by ACM's own executives and employees.  ACM further caused the funds it owns and controls to publicly concede that ACM's own executives and employees violated Section 10(b) of the Securities Exchange Act of 1934, knew of their fraud, concealed the details of their fraudulent activities, obtained illegal profits in the hundreds of millions of dollars from their fraud, and acted with scienter and intent to defraud in pursuing the exact scheme first described by Cascade nearly two years ago.  Through this action, Plaintiff seeks to hold ACM accountable for its long-overdue confession of the fraud it hosted and for which it is responsible.

## PARTIES

1.      The Cascade Fund, LLLP ("Cascade" ), is a limited liability limited partnership organized under the laws of the State of Colorado with its offices in Evergreen, Colorado. During the Class Period prescribed herein Cascade purchased securities in certain Absolute Capital hedge funds sponsored by the ACM Defendants as follows:

| Date | Interest Purchased | No. of Units | Total |
|---|---|---|---|
| 7/1/05 | Absolute Return Europe Fund | 107.1 | $700,000 |
| 10/1/05 | Absolute East West Fund | 76.576 | $400,000 |
| 2/1/06 | Absolute East West Fund | 68.463 | $400,000 |
| 7/2/07 | Absolute Germany Fund | 117.1 | $700,000 |
| 1/7/05 | Absolute India Fund | 85.04 | $500,000 |

2.      This case concerns hedge funds known as the Absolute East West Fund Limited (the "East West Fund") and Absolute East West Fund L.P., Absolute Return Europe Fund ("Return Europe Fund"), Absolute Octane Fund Limited and Absolute Octane Fund L.P.

(collectively "Octane Fund"),  Absolute European Catalyst Fund Limited ("European Catalyst Fund"),  Absolute Activist Value Fund ("Activist Fund"), Absolute Germany Fund Limited ("Germany Fund") and Absolute India Fund Limited ("India Fund").  (Collectively, all of the aforementioned funds are referred to as the "Absolute Capital Funds" or the "Funds").  Plaintiff has suffered damages as a result of the wrongful acts of the ACM Defendants as alleged herein.

3.      Defendant ACMH Limited, formerly known as Absolute Capital Management Holdings Limited ("ACM") is a Grand Cayman entity.  It was at all relevant times the Investment Manager for each of the Absolute Capital Funds and an affiliate of each Fund. According to its financial statements, at all times material to the allegations in this Second Amended Complaint, Defendant ACM employed approximately 20 individuals.

4.      Defendant Florian Homm ("Homm") is a foreign national who effectively controlled some or all of the Absolute Capital entities.  His business card referred to him as "Founder and Director" of ACM, where he was also Chief Investment Officer.  Homm, during the time of the fraudulent activities described herein, owned approximately 50% of ACM, served as an officer, director and control person of ACM, and acted as a corporate agent of ACM in conducting the activities described herein.

5.      Defendant Sean Ewing ("Ewing") is a foreign national who at all relevant times was a founder, chairman, and chief executive officer of ACM.  At all times material to this Second Amended Complaint, Ewing was an officer, director and control person of ACM, and acted as a corporate agent of ACM in conducting the activities described herein.

6.      Defendant Ullrich Angersbach ("Angersbach") is a German national who at all relevant times was a director of ACM.  Angersbach was actively engaged in soliciting

investments for the Absolute Capital Funds.  At all times material to this Second Amended

Complaint, Angersbach was an officer, director and control person of ACM, and acted as a

corporate agent of ACM in conducting the activities described herein.

7.     Argo Group Limited ("Argo Group") is a capital management firm based in

London, England.   Argo Group is a successor to ACM.

8.     Collectively, Defendants Homm, Ewing, and Angersbach are referred to herein as

the "Individual Defendants" and, together with defendant ACM, as the "ACM Defendants."

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to § 27

of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.  The claims asserted herein arise

under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b)

and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17

C.F.R. 240.10b-5.

10.    Venue is proper in this District pursuant to § 27 of the Securities Exchange Act,

15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391 (b) and (c) in that many of the acts and transgressions

alleged herein occurred in substantial part in this District.

11.    In connection with the wrongful acts alleged in this Complaint, the ACM

Defendants, individually and collectively, both directly and indirectly, used the means and

instrumentalities of interstate commerce, including, but not limited to, the United States mails,

interstate telephonic communications and interstate electronic communications to (a) sell

interests in the Absolute Capital Funds to Plaintiff and the members of the Class; (b) provide

investment materials, including the Funds' offering memoranda ("Offering Memoranda") and

4

investment management agreements ("Investment Management Agreements"), to solicit

investments in the Absolute Capital Funds from Plaintiff and the members of the Class; and (c)

trade in illiquid, speculative "pink sheet" stocks on behalf of the Absolute Capital Funds in

which Plaintiff and the members of the Class were invested.  More particularly, for purposes of

jurisdiction and venue, significant acts and substantial conduct of the ACM Defendants

undertaken in the United States are material to Plaintiff's claims and caused the damages

suffered by Plaintiff and the members of the Class, such as:

(a) Hunter World Markets ("Hunter"), through which Defendant Homm engaged in the illicit transactions described below, is a U.S. brokerage firm.

(b) The transactions with Hunter World Markets described below occurred in the United States.

(c) The illiquid penny stocks purchased through Hunter and held by the Absolute Capital Funds represented shares of ownership in U.S. companies.

(d) Defendant Homm's secret profits through Hunter, as detailed more fully below, were "earned" or procured in the United States and were conveyed to him from the United States.

(e) As disclosed by ACM itself in September 2007, roughly half a *billion* dollars of the Absolute Capital Funds' assets were affected when the U.S. penny stocks were marked to market price "as reported through the US-based Over the Counter Bulletin Board/Pink Sheets."  The effects of this trading were so severe as to prompt ACM to restrict redemptions in the Absolute Capital Funds and to create the "side pockets" discussed below.

(f) The Offering Memoranda for the Absolute Capital Funds that are described herein and that were prepared by the ACM Defendants were distributed to Plaintiff and the Class members in the United States, including in this District, and were disseminated using the means and instrumentalities of interstate commerce. Voluminous other materials used by Defendants to solicit investments from members of the Class and thereafter to report to them the supposed progress of the Absolute Capital Funds, as described below, were disseminated to U.S. investors using the means and instrumentalities of interstate commerce.

(g) Plaintiff and the members of the Class determined to purchase their interests in the Absolute Capital Funds in the United States, including in this District, and

conveyed payment for the purchase of their interests in the Absolute Capital Funds to Defendants using the means and instrumentalities of interstate commerce.

## BACKGROUND FACTS PERTINENT TO PLAINTIFF'S CLAIMS

12.     This case concerns an international fraudulent securities scheme based on the illicit purchases of hundreds of millions of dollars of securities in illiquid U.S. penny stocks of shell companies in the names of multiple Absolute Capital hedge funds.  ACM and those Funds have now admitted that fraudulent scheme. When the truth about these illicit purchases was revealed in September 2007, the value of the hedge funds promptly plunged by up to 40%, or by hundreds of millions of dollars in the aggregate.

13.     Return Europe Fund, East West Fund, European Catalyst Fund, Octane Fund, Germany Fund, India Fund and Activist Fund are all entities that were formed, controlled and operated by the ACM Defendants to perform as hedge funds.  In general, each fund solicited and received funds from investor shareholders for the purpose of investing those funds for profit.

(a)     The Return Europe Fund is a company incorporated under the laws of the Cayman Islands.  The Offering Memorandum for the Return Europe Fund is dated January 1, 2004, and the Return Europe Fund has filed various reports with the United States Securities and Exchange Commission ("SEC") since 2005.

(b)     The Absolute East West Fund Limited and Absolute East West Fund L.P. are companies incorporated under the laws of the Cayman Islands.  Both funds invest shareholder funds through a "master-feeder" fund structure in Absolute East West Master Fund Limited, a Cayman Islands company.  The Offering Memorandum for the East West Fund is dated June 24, 2005 and both funds filed a notice of sale of securities with the SEC in July 2007.

(c)     The European Catalyst Fund is a company incorporated under the laws of the Cayman Islands.

(d)     The Absolute Octane Fund Limited and Absolute Octane Fund L.P. are companies incorporated under the laws of the Cayman Islands.  Both funds invest shareholder funds through a "master-feeder" fund structure in Absolute Octane

Master Fund Limited, a Cayman Islands company.  Both funds filed a notice of sale of securities with the SEC in July 2007.

(e)     The Activist Fund is a company incorporated under the laws of the Cayman Islands.  It filed certain reports with the SEC in 2007.

(f)     The Absolute Germany Fund is a company incorporated under the laws of the Cayman Islands.  The Offering Memorandum for this Fund is dated July 30, 2004.

(g)     The Absolute India Fund is a company incorporated under the laws of the Cayman Islands.  The Offering Memorandum for this Fund is Dated May 2007.

14.     The terms and conditions under which the Funds operated, including the investment policies and objectives of the Funds and the manner by which the Funds' assets would be valued, were communicated to Plaintiff and the members of the Class through Offering Memoranda that were prepared collectively by the ACM Defendants and represented the collective input of ACM and its officers and directors.

15.     Each of the Absolute Capital Funds, acting through the Individual Defendants, engaged ACM to act as its "Investment Manager."  Each Fund engaged its affiliate, ACM, pursuant to a written Investment Management Agreement prepared and/or reviewed by the Individual Defendants and made available to prospective investors.  Pursuant to these Investment Management Agreements, ACM was obligated to "comply with any restrictions contained in the … Offering Memorandum issued by the Fund, and shall comply with such investment policies as may be set out in the Offering Memorandum … ."  These agreements further assigned ACM specific duties in connection with determining the Net Asset Value of each fund, as further discussed below.

16.     Each Absolute Capital Fund was a conduit for its affiliate, Defendant ACM.  As conceded in each Fund's Offering Memorandum, "[t]he Fund does not have, nor has it had since

its inception, any employees."  Having no employees, each Fund necessarily relied on others to prepare and distribute the misleading Offering Memoranda pursuant to which investments were solicited and shares were sold.  ACM and the Individual Defendants filled that function for each Fund.  Indeed, the Funds (and ACM) even admitted in the New York Federal Action (discussed below) that ACM's officers exercised "control over the Funds."  Exhibit A at ¶5(a).

17.     The Offering Memoranda each concede that ACM was an "Interested Party" of the Fund.  The sole directors of the Funds were also directors of ACM.  The Offering Memoranda warned investors that representations *other than* those contained in the Offering Memoranda must not be relied on "as having been authorized by … the Investment Manager [ACM]."  In this fashion investors were advised that representations in the Offering Memoranda *were* authorized by ACM.  In addition, only ACM, as the sole Investment Manager for the Funds, could determine the investments made by the Funds.

18.     ACM completely controlled each Fund because, as further conceded in the Offering Memoranda, "[o]nly the Management Shares owned by the Investment Manager [ACM] have voting rights [in the Fund and] only the Investment Manager therefore can appoint and remove the Directors of the Fund."  The Offering Memoranda further concede that ACM "holds [all] Management Shares, which are the only voting shares in the Fund."   In addition, ACM held powers of attorney to invest on each Fund's behalf.

19.     ACM's dominance and control of the Fund was further reflected in the Offering Memoranda's admission that "[t]he Fund's investment performance will depend substantially on the services of the principals of the Investment Manager …"   ACM, in correspondence with

investors, referred to the Absolute Capital Funds as "our funds" and to those very investors as "our investors."

20.     In short, ACM was a primary violator of the federal securities laws in connection with Plaintiff's purchases of securities in the Absolute Capital Funds.  Indeed, ACM was **the** primary violator in connection with those purchases.

21.     ACM typically charged each fund a Management Fee based on the particular Fund's net asset value, *i.e.,* an annual fee equal to 2% of the Fund's net asset value.  In addition, ACM also charged a Performance Fee of 20% per annum of the Fund's net profits.  In the aggregate, ACM and the Absolute Capital hedge funds had roughly two *billion* dollars under management, and ACM and each of the Individual Defendants profited personally from the fees collected via ACM's management of the assets of the Funds.

22.     More than any other single person, Florian Homm controlled and directed the activities of ACM.  Homm beneficially owned more than 50% of ACM.  ACM aggressively touted Homm's purported investment acumen, and particularly touted his expertise in European investments and European companies.  Homm was the high-profile Chief Investment Officer of ACM at all relevant times between 2004 and September 2007 while ACM managed the assets of the Funds, in which ACM also owned the only voting shares.  Homm's prior work experience included employment with Merrill Lynch and Fidelity Management and Research in New York and Boston, respectively.

23.     In September 2007, Homm suddenly and unexpectedly resigned as Chief Investment Officer of the Absolute Capital Funds in conjunction with disclosures concerning Homm's investment activities with the Funds' assets.  As reported in the press, "many Absolute

investors found themselves looking at big losses after it emerged in the days after Mr. Homm's disappearance that a substantial amount of his holdings had been in bulletin board, or 'pink' sheet stocks."  Stocks known as "bulletin board" stocks or "pink sheet" stocks are stocks in companies that cannot meet the requirements to be listed on a national securities exchange.  Such stocks are universally recognized in the securities industry to be illiquid, thinly-traded, and speculative. They are often stocks in start-up companies.  Such stocks are far more susceptible to market manipulation than stocks traded on a national exchange.

24.    The "big losses" initially reported in the press were an understatement.  In a September 19, 2007 press release by ACM, ACM revealed that the Absolute Capital Funds' investments in illiquid "US-based Over the Counter Bulletin Board/Pink Sheet" stocks were "approximately $440 million to $530 million of the equity funds' assets."  ACM revealed that some of the Funds had large percentages of their entire portfolios invested in such illiquid positions, including the following:

| Fund | Illiquid positions % of assets |
| --- | --- |
| Absolute Return Europe | 35-40% |
| Absolute European Catalyst | 25-30% |
| Absolute East West | 15-20% |
| Absolute Octane | 40-45% |
| Absolute Activist Value | 10-15% |

25.    The sudden revelation that, over a period of time that extended through several years including the Class Period (as described in this Second Amended Complaint), ACM had invested roughly half a *billion* dollars in illiquid U.S. penny stocks, contrary to the provisions

contained in the Funds' Offering Memoranda and Investment Management Agreements, caused the value of investments in the Absolute Capital Funds to plunge and to put ACM in a financial crisis.

26.     Promptly upon disclosure of these enormous illiquid positions in Funds that had been under ACM's complete control, many investors sought to redeem their shares in the Funds. ACM responded by freezing redemptions and undertaking to "restructure" the Funds.  This restructuring included the transfer of the enormous illiquid positions held by the Funds into "side pockets" to be maintained and managed separately from the other assets within each Fund.

27.     Despite the European focus of the Absolute Capital Funds and of Homm himself, as depicted in the Offering Memoranda, ACM's disastrous investments were made largely in illiquid stocks of speculative *American* penny stock shell companies that were traded, if at all, over the counter in the United States.  Worse still, as discussed below, many were acquired through a penny stock brokerage firm in the United States in which Homm was secretly a half-owner.

28.     Shortly after the September 2007 disclosures concerning Homm's investment activities and the collapse of the Absolute Capital Funds, the Funds' auditors (Ernst & Young) resigned from their engagement with Absolute Capital.

29.     Shortly after the September 2007 disclosures and the collapse of the Absolute Capital Funds, the Administrator for the Funds (Fortis Prime Fund Solutions IOM Limited) resigned from its engagement with Absolute Capital.

30.     Shortly after the collapse of the Absolute Capital Funds and the September 2007 disclosures concerning Homm's investment activities, ACM announced that it had engaged an

outside auditor to investigate the reasons for the collapse.  ACM has not publicly disclosed the results of this investigation.  Upon information and belief, however, the auditors' investigation is the basis for the Funds' lawsuit (discussed below) against the Individual Defendants which asserts – exactly as Cascade first alleged in June 2008 – that ACM's executive officers and employees violated the federal securities laws.

### ACM AGGRESSIVELY SOLICITED INVESTMENTS FROM UNITED STATES INVESTORS AND UNITED STATES INVESTMENT MANAGERS OR ADVISORS

31.     Although many investors in the Absolute Capital Funds reside outside the United States, primarily in Europe, numerous investors, including Plaintiff and the members of the Class, are residents of the United States and/or are controlled and managed by residents of the United States.

32.     ACM maintained marketing or distribution agreements with various persons in the United States to promote and sell shares of the Absolute Capital Funds to investors in the United States and elsewhere.  ACM or its affiliates had one or more employees who resided in the United States who participated in the marketing and distribution of Absolute Capital investments in the United States.  These marketing and distribution activities included providing Plaintiff and the other members of the Class with the written Offering Memoranda and other Fund investment materials in an effort to induce investment in the Funds.

33.     As noted, the Funds themselves had no employees.  ACM provided the Funds' written Offering Memoranda, which it had prepared through the actions of its executives and authorized agents, *i.e.,* Homm, Ewing, Angersbach and other employees of ACM, to Plaintiff and the other members of the Class as part of its solicitation of investments from United States investors and from investors who were controlled or managed by United States residents.  Some,

but not all, Offering Memoranda stated falsely that U.S. residents were not "Eligible Investors" and could not become shareholders.  For example, the Offering Memorandum for the European Catalyst Fund stated that "Participating Shares are not available for subscription . . . by U.S. Persons."  The Offering Memoranda for East West Fund and Return Europe Fund contained the same restriction.

34.     Despite these written representations, the ACM Defendants aggressively solicited and accepted more than $70 million in dollar-denominated accounts and nearly 12 million Euros in euro-denominated accounts from more than 80 U.S. investors or investors controlled or managed by U.S. residents.  To that end, the ACM Defendants caused the Offering Memoranda to be delivered to U.S. investors, including Plaintiff and the Class members, using the means and instrumentalities of interstate commerce.  In addition to Offering Memoranda, the ACM Defendants sent prospective and actual U. S. investors colorful presentations identifying ACM's investment team, describing their supposed "Objectives," "Strength," "Competitive Advantage," "Research Philosophy," "Company Assessment," "Short Portfolio Characteristics," "Long Portfolio Characteristics," "Portfolio Construction" (none of which ever disclosed ACM's investment philosophy of buying hundreds of millions of dollars of U.S. speculative penny stocks through an unknown brokerage firm half-owned by Homm), "Risk Management," "Investment Awards" and "Investment Distinctions."

35.     In addition, ACM and the Individual Defendants solicited investments from U.S. investors via email and other direct communications directed at Plaintiff and the members of the Class in the United States, including in this District.  Many of these solicitations were made personally by defendant Homm.  In connection with soliciting investments from United States

investors, the ACM Defendants sent prospective investors in the United States numerous

curriculum vitae of ACM personnel, including defendants Florian Homm and Ullrich

Angersbach.  Similarly, ACM sent Plaintiff and other members of the class "Due Diligence"

reports that purported to describe the Funds' facts, structure, investment philosophy, objectives,

and other information about the Funds.

36.     The ACM Defendants periodically sent portfolio managers or other investment

professionals employed by ACM to the United States to meet with U.S. investors and U.S.

investment advisors.  As recently as May 2008, ACM sent fund managers to New York to

conduct meetings with investors.

37.     In 2006, ACM altered its strategy for soliciting investments from U.S. residents

by establishing parallel funds designed specifically for U.S. investors.  For example, ACM

established Absolute East West Fund L.P. to be marketed in tandem with Absolute East West

Fund Limited.  The only significant difference between the two was that the "L.P." could be sold

to U.S. investors but the "Limited" was restricted to foreign investors.  All assets of the two

funds together would be invested together through a "master-feeder" fund structure.  A similar

master-feeder structure was established for the Octane Fund.  ACM established the master-feeder

structure in order to promote these two funds, in particular, to U.S. investors.  The Offering

Memoranda for the L.P. funds specifically noted that Absolute Capital had retained a New York

law firm to be "Legal Advisers as to matters of U.S. law."

38.     Upon obtaining investments from Plaintiff or any other member of the Class,

Defendants thereafter sent the investor or its investment manager (in the United States) frequent

reports purporting to describe the Funds' performance, net asset values, performance relative to

other funds and to industry benchmarks, and other information.

39.     The Offering Memoranda prepared by the ACM Defendants and distributed to

U.S. investors and to U.S. residents who controlled or managed foreign investors contained

numerous fraudulent misrepresentations and omissions.  The scheme at the heart of the material

misrepresentations and omissions was a secret business venture by Homm, acting as ACM's

Chief Investment Officer and authorized corporate agent, to use the enormous funds under

ACM's supervision to generate illicit personal profit for ACM and the Individual Defendants,

and the continuing efforts to hide the scheme from investors.

## ACM'S SECRET SCHEME WITH HUNTER WORLD MARKETS
## AND TODD FICETO

40.     Though never disclosed in the Offering Memoranda or in any other

communication between the ACM Defendants and the members of the Class, ACM and

Defendant Homm had an extensive business relationship with Hunter, the penny stock brokerage

firm in California.  Homm secretly owned 50% of Hunter.

41.     Homm's only partner in Hunter World Markets was Todd M. Ficeto, with whom

Homm had a lengthy history.  Hunter formerly was called VMR Capital Markets US, and was so

named because of its partial ownership by VMR Germany, a German company controlled by

Florian Homm.

42.     Ficeto, as Homm knew, had a substantial disciplinary history in the securities

industry.  Ficeto's securities industry history included the following:

> In 1996, Ficeto was suspended by the National Association of
> Securities Dealers from recommending any transactions in penny
> stocks for two years for violating the NASD Rules of Fair Practice;

In 1997, the State of Ohio rejected Ficeto's application for an Ohio securities salesman license;

In 2002, the NASD censured and fined Ficeto and VMR Capital Markets for failing to report customer complaints and for Ficeto executing securities transactions without being properly registered with the NASD; and

In 2003, Ficeto was fined and suspended by the NASD from all supervisory capacities for "serious" and "reckless" supervisory failures.

43.     Neither ACM nor Homm ever disclosed Homm's partnership with Ficeto and Hunter to Plaintiff or the other members of the Class.  Instead, ACM, acting through its corporate agent Homm in his capacity as Chief Investment Officer of ACM and through other ACM employees identified in Exhibit A, secretly steered hundreds of millions of dollars of the Absolute Capital Funds' assets, in which Plaintiff and the members of the Class had invested, into the purchase of wildly speculative penny stocks from Hunter without informing investors and in direct contravention of the Funds' investment policies and objectives, as described in the Funds' Offering Memoranda.

44.     As conceded by ACM and its Funds, the scheme to defraud was in place "from at least September 2004."  Exhibit A at ¶ 27.  Thus, the scheme predates any purchases in the Absolute Capital Funds by Plaintiff Cascade.  For example, in December 2004 and January 2005, prior to any investment in the Absolute Capital Funds by Cascade, employees of ACM, including but not limited to defendant Homm, entered into subscription agreements with "The Hunter Fund, Ltd.," an affiliate of Hunter, to purchase shares in "The Hunter Fund."  These December 2004 and January 2005 subscription agreements were executed on behalf of at least the European Catalyst Fund and the Return Europe Fund by both Defendant Homm and by two

16

other ACM employees – Darius Parsi and Colin Heatherington.  By this time – December 2004 and January 2005 – ACM began purchasing millions of dollars worth of unlisted securities through The Hunter Fund for at least the Return Europe Fund and the European Catalyst Fund.

45.     The Hunter Fund was created by Hunter in August 2002.  Even years later, however, by the time ACM began subscribing to millions of dollars of purchases of unlisted securities through The Hunter Fund, The Hunter Fund never had financial statements audited by an independent auditor.  ACM did not let The Hunter Fund's lack of audited financial statements deter it from investing the Funds' monies in The Hunter Fund.

46.     Under the terms of the Absolute Capital Funds' investment arrangement with Hunter and The Hunter Fund, the Funds paid The Hunter Fund a yearly management fee of 2%, and, after January 1, 2006, a quarterly performance fee equal to 5% of the net asset value of the shares held in The Hunter Fund.  These fees were in addition to those paid by the Funds to ACM as "Investment Manager" but were not disclosed to Plaintiff in the Offering Memoranda nor in the Investment Management Agreements for the Funds in which Plaintiff invested, although The Hunter Fund fees are referenced in electronic mail ("email") communications between ACM employees and Hunter employees.

47.     Throughout 2005, 2006, and 2007, numerous email communications were exchanged between ACM employees (including, but not limited to, defendant Homm) and employees of Hunter regarding the investments, management, and operation of the Absolute Capital Funds' investments in The Hunter Fund as well as other investments made by ACM through Hunter on behalf of the Funds.  At least 13 ACM employees (out of a total of

approximately 20) dealt with Hunter or The Hunter Fund and knew of their focus on illiquid, unlisted, speculative U.S. penny stocks of shell companies.

48.     Numerous email communications were exchanged throughout 2005, 2006, and 2007 between ACM employees (including, but not limited to, defendant Homm) and Ficeto, head of Hunter, regarding the investment purchases, sales, positions and strategies taken by Hunter in connection with investment purchases and sales made by Hunter on behalf of the Absolute Capital Funds.  For example, in August 2007, one month prior to ACM's disclosure of Homm's resignation, ACM employees sought information from Hunter regarding a number of different American companies in which Hunter had invested on the Funds' behalf.  These email communications requested information on a series of unlisted, microcap American companies in which Hunter had invested the Return Europe, East West and other Absolute Capital Funds.  These companies included Intermetro Communications, Inc., Java Detour, Inc., Logistical Support, Inc., MicroMed Cardiovascular, Inc., and Pro Elite, Inc.  One email from an ACM employee advises that "These are all from Hunter World Markets.  Todd Ficeto will be able to put you in contact with the companies."  (As shown in Exhibit A, these companies often consisted of nothing *other than* Todd Ficeto.)

49.     In response to the ACM email identifying the above-referenced companies as "all from Hunter World Markets," Ficeto sent an email directly to David Johnston and Colin Heatherington, both of whom were ACM employees, stating that "we [Hunter] are custodian to the shares mentioned as well as the broker on the transactions" for these shares held by the ACM Funds.  As discussed below, none of the identified companies [*i.e.,* Intermetro Communications, Inc., Java Detour, Inc., Logistical Support, Inc., MicroMed Cardiovascular, Inc., and Pro Elite,

Inc.] meet the Funds' investment criteria as described in the Offering Memoranda distributed to Plaintiff and other ACM investors.

50.     In addition to The Hunter Fund subscription agreements executed by ACM employees, Hunter and Ficeto maintained significant cash accounts to facilitate trading on behalf of the Absolute Capital Funds.  Email communications between ACM employees (including, but not limited to, defendant Homm) and Ficeto (at Hunter) confirm the balances on these cash accounts held by Hunter for, *inter alia,* the Return Europe Fund, the Octane Fund, and the East West Fund.

51.     ACM employees regularly facilitated the transactions between the Absolute Capital Funds and Hunter as part of Homm's scheme.  For example, a July 2007 email from Hunter sent to Colin Heatherington at ACM, requests that Heatherington "please get Florian [Homm] to sign these [documents relating to the Pro Elite investment made through Hunter]."

52.     Homm frequently coordinated his investment scheme with Ficeto through other ACM employees.  As noted, the majority of ACM's personnel communicated with Hunter.  In one November 2006 email sent to Ficeto and copied to other ACM employees, Homm says that the "spark appears to be progressing well above plan !!! Are joe, alon others selling thru u, are there shares at HWM?"  He then asks Ficeto to "Please communicate with my guys …[at ACM]."  Ficeto subsequently confirms that he "just spoke with Colin [Heatherington, at ACM] about this issue."

53.     The relationship between Hunter and ACM was so close that Hunter provided ACM with drafts of financial statements for The Hunter Fund when such statements were finally prepared in early 2006, more than a year *after* ACM had entered into subscription agreements

with The Hunter Fund.  This draft of audited financial statements for The Hunter Fund covered more than 3 years, from August 2002 through December 31, 2005, and describes the vast majority of The Hunter Fund's investments as "restricted securities" that have an "inherent uncertainty of valuation."  These "restricted securities" comprised 73% of The Hunter Fund's holdings and among those holdings identified in the draft financial statements are at least four unlisted American microcap companies (Novint Technologies, Inc., MicroMed Cardiovascular, Inc., Logistical Support, Inc., and Cyberkinetics Neurotechnology Systems, Inc.) held by the Absolute Capital Funds.

54.     As described above, The Hunter Fund made substantial purchases in "restricted equities" that, according to a draft of an independent auditor's description provided by Hunter to ACM in early 2006, had an "inherent uncertainty of valuation."  Neither the existence of "The Hunter Fund" nor the securities of inherently uncertain value in which it invested was disclosed in the Offering Memorandum for the Return Europe Fund when Cascade purchased 107.1 units in the Return Europe Fund in July 2005 or when Cascade purchased units in the East West Fund in 2005 and 2006.

55.     Homm's transactions with Hunter generated huge profits for Hunter in a variety of ways, which in turn generated secret profits for Homm himself.  Although the transactions that produced these profits were regularly conducted through ACM employees dealing directly with Hunter, ACM never disclosed to Plaintiff or the other members of the Class that their assets were diverted to Hunter in order to generate profits for ACM and for Homm.  The self-serving investments of ACM and Homm included the following:

(a)     In May 2004, ACM, acting through Defendant Homm, spent $1.5 million of Absolute Capital Funds investor funds to acquire 2.5 million shares of stock in

20

Universal Guardian Holdings, Inc., a California penny stock company.  As part of that transaction, Universal Guardian Holdings issued stock purchase warrants *to Hunter* – not to the Absolute Capital Funds – with a value of $883,298.  Instead of the warrants being delivered to the Absolute Capital Funds, Defendant Homm kept the warrants for his firm and thus for himself.  Homm did not disclose his conflict of interest or his secret profit to Plaintiff or the other members of the Class.  The investment of the Absolute Capital Funds in Universal Guardian Holdings was virtually completely lost.

(b)     By March 2005, after ACM had executed the subscription agreements with Hunter described above, the Return Europe Fund and European Catalyst Fund each had large investments in a California penny stock called Logistical Support, Inc.  Hunter itself had a large direct investment in Logistical Support.  Thus, Homm, listed in Logistical Support's Form 10-K as the person who controlled the Return Europe Fund, used investor money to prop up a penny stock in which he was beneficially a large personal shareholder.  Homm did not disclose his conflict of interest in using investor money to prop up a personal investment.  The investment of the Absolute Capital Funds in Logistical Support was virtually completely lost.  Cascade invested in the Return Europe Fund in July 2005 based on an Offering Memorandum that disclosed nothing regarding these activities between ACM, the Return Europe Fund, and Hunter.

(c)     In August 2005, ACM, acting through Defendant Homm as Investment Advisor for the Absolute Capital Funds, caused the Return Europe Fund, European Catalyst Fund, and Octane Fund to collectively invest $4 million in a penny stock company called Micromed Cardiovascular Inc.  As a result of Homm's investment of Absolute Capital Funds' investor funds, warrants to purchase about 1.8 million shares of Micromed stock were issued *in the name of Hunter*.   Instead of retaining those warrants for his investors, Homm specifically caused the Absolute Capital Funds to assign those warrants to Hunter – and thus derivatively to himself.  In contrast, others who invested in Micromed at the same time kept the warrants for themselves.  Cascade invested in the Return Europe Fund based on Offering Memoranda that disclosed nothing about these Micromed activities.  The investment of the Absolute Capital Funds in Micromed was virtually completely lost.

(d)     In May 2007, ACM, acting through Defendant Homm as Chief Investment Officer for Return Europe Fund, European Catalyst Fund, and East West Fund, bought large blocks of stock in a U.S. penny stock called Quest Group International, in which Hunter was a large shareholder.  Within months, Hunter apparently sold *its* stock for huge profits.  Thus, Homm helped promote a classic "pump and dump" of a penny stock for the benefit of Hunter and, thus, of himself.  Defendant Homm did not disclose his conflict of interest in using investor money to prop up a personal investment in the Offering Memoranda for these Funds.

(e)     In late 2006, ACM, acting through Defendant Homm and others, caused several Absolute Capital Funds to acquire stock in Java Detours, Inc., a California fast food and beverage company.  In the aggregate, about 41% of Java Detours stock, at a price in excess of $10 million, was acquired by various Absolute Capital Funds and was held "c/o Hunter World Markets, Inc." in Beverly Hills, California.  Hunter received $1 million in cash, plus warrants for placing the stock with its affiliate, ACM.  Homm did not disclose his conflict of interest in using investor money to generate large profits for Hunter, and derivatively for himself.

(f)     In October 2006, ACM, acting through Defendant Homm, caused several of the Absolute Capital Funds to purchase an aggregate of $10 million of stock in a U.S. penny stock company called Pro Elite, Inc., which promoted mixed martial arts matches.  The stock was marketed by and acquired through Hunter, which was paid more than $1 million for placing the stock with its affiliate, ACM. Thereafter, in July 2007, Hunter received another $2.5 million in commissions and more than 3 million warrants when Absolute Capital Funds purchased another $20 million of Pro Elite stock.

(g)     In June 2005, only one month before Cascade invested in the Return Europe Fund in reliance on the Offering Memorandum distributed by ACM, ACM, acting through Defendant Homm, caused the Return Europe Fund to acquire approximately $3.6 million in stock in a U.S. penny stock company called Berman Center, Inc., which operated a women's sexual health clinic in Chicago, Illinois.   The stock was marketed by and acquired through Hunter.

(h)     In May through June of 2007, ACM, acting through Defendant Homm, caused several Absolute Capital Funds, including Return Europe Fund, European Catalyst Fund, and Activist Value Fund, to purchase more than $20 million in stock of NuRx Pharmaceuticals, Inc., through Hunter.  Hunter received more than $2 million in cash, more than 12 million shares and in excess of 10 million warrants as compensation for placing the stock in the Absolute Capital Funds.

(i)     In May 2004, certain Absolute Capital Funds, including Return Europe Fund and European Catalyst Fund, acquired through Hunter more than $3 million in stock of Novint Technologies, Inc.  Hunter was paid half a million dollars in cash, more than 260,000 shares and in excess of 1.5 million warrants from Novint Technologies.

(j)     In December 2006, Hunter placed more than $10 million of stock in Lucy's Café, Inc., through ACM and Defendant Homm, into various Absolute Capital Funds, including Return Europe Fund, European Catalyst Fund, East West Fund, Octane Fund, and Activist Value Fund.  In return for this placement, Hunter received more than $1 million in cash, 4 million shares of stock and warrants.

Standing alone, the sheer volume of transactions between the Absolute Capital Funds and Hunter, the little-known penny stock firm in California, informed all of ACM's officers, directors, employees and control persons that the financial operations and investments of the Absolute Capital Funds differed materially from the "Investment Objective and Strategy" descriptions provided in the Offering Memoranda, and that there was a substantial conflict of interest and risk of illegality in the activities between ACM and Defendant Homm, on the one hand, and Hunter. Moreover, the majority of ACM's employees – and all of its executives – dealt directly with Hunter and knew the type of stocks in which it dealt.

56.     The Offering Memoranda prepared by the ACM Defendants and distributed by ACM to Plaintiff and the members of the Class omit the following material facts:

(a)     The Offering Memoranda never disclose that Defendant Homm, who was specifically identified as an "Investment Advisor" to the Funds, had a secret large stake in Hunter World Markets;

(b)     The Offering Memoranda never disclose that ACM, through defendant Homm and other ACM employees, had subscribed on behalf of the Absolute Capital Funds (including the Return Europe Fund in which Cascade later invested) to invest in The Hunter Fund which predominantly invested in "restricted securities" that had an "inherent uncertainty of valuation" resulting in the Funds' participation in wildly speculative transactions with Hunter;

(c)     The Offering Memoranda never disclose that Defendant Homm generated large secret profits for himself and other ACM employees by directing the Funds to buy what ACM and the Funds now admit were "next-to-worthless" securities in U.S. penny stock shell companies and then engaging in intra-Fund trades for the sole purpose of artificially inflating the prices of those securities for Homm's and ACM's benefit (*see* Exhibit A at ¶¶30-34);

(d)     The Offering Memoranda never disclose that Defendant Homm caused ACM to assign valuable rights (such as warrants) to Hunter;

(e)     The Offering Memoranda never disclose that Homm had a scheme in place to trade what ACM now calls "next-to-worthless securities" amongst the various Absolute Capital Funds to create the false illusion of active trading in order to

justify prices that ACM now admits were "virtually made up as they went along" (*see* Exhibit A at ¶34); and

(f)      The Offering Memoranda never disclose that Homm's partner in Hunter World Markets was Ficeto and never disclosed Ficeto's dubious regulatory history.

57.     Any reasonable investor would have considered ACM's relationship with Hunter, Defendant Homm's secret partnership with Hunter and Ficeto, Hunter's focus on "restricted securities" having an "inherent uncertainty of valuation" and ACM's practice of trading worthless U.S. penny stocks amongst the Absolute Capital Funds in order to create the false illusion of market activity in the stocks to be material facts warranting consideration in deciding whether to invest in the Absolute Capital Funds.

58.     The Offering Memoranda contained only boilerplate disclosures that conflicts of interest "may arise", that if conflicts of interest actually *did* arise they would be resolved fairly, and that any transactions between a Fund and an "Interested Party" (such as ACM or Homm) would be "only on an arms-length basis."  In light of the scheme to defraud described herein that was already in place at the time the statements were made, the massive undisclosed conflicts of interest between ACM and the Funds, the fraudulent intra-Fund trading designed to grossly inflate the prices of stocks held by ACM's executives before they traded those "next-to-worthless" stocks to the Funds at  exorbitant prices throughout the Class Period, and other actions described herein, the ACM Defendants' omissions rendered these statements egregiously false and misleading.

59.     The sudden collapse of the Absolute Capital Funds and of ACM in September 2007 was primarily attributable to ACM's investments in U.S. stocks acquired through Hunter, a U.S. penny stock broker-dealer.  As noted, ACM, itself, in September 2007 press releases

disseminated to the public, attributed the collapse to holdings of illiquid "US-based Over the Counter Bulletin Board/Pink Sheet" stocks.  According to ACM, even funds in the Absolute Capital family of funds that had few of the illiquid stocks were "caught in the downdraft brought on by the sudden and unexpected resignation of Florian Homm."

### ACM AND ITS FUNDS FILED SUIT IN FEDERAL DISTRICT COURT IN NEW YORK IN WHICH THEY CONFESSED TO VIRTUALLY ALL OF THE MATERIAL ALLEGATIONS UNDERLYING CASCADE'S CLAIMS AGAINST ACM

60.     In October 2009 – more than fifteen months **after** Cascade filed its original Complaint in this action – all of the Absolute Capital Funds filed suit against, *inter alia,* the Individual Defendants Homm, Ewing and Angersbach.  The case is *Absolute Activist Value Master Fund Limited, et al. v. Florian Homm, et. al*, No. 09 CIV8862 (S. D. N. Y.) ("the New York Federal Action").  In November 2009, the Absolute Capital Funds filed an Amended Complaint that is now the operative complaint in the New York Federal Action and is attached hereto as Exhibit A.   As noted, ACM owns all Managing Shares of each Fund and has sole authority to appoint directors of each Fund.  The Funds have no employees of their own.  For these and other reasons, the actions of the Funds are controlled and dictated by ACM.

61.     ACM caused its Funds to file the New York Federal Action.  ACM caused its Funds to make the allegations found in the Amended Complaint in the New York Federal Action.

62.     ACM and its Funds allege and admit in the New York Federal Action that ACM's majority shareholder, Chairman, CEO, Chief Investment Officer and other employees engaged in "brazen criminal fraud … through an elaborate scheme to defraud" (Exhibit A at ¶1, ¶3) involving **exactly the same U.S. penny stocks identified by Cascade nearly two years ago**

25

**and in ¶ 55, above.**  *See* Exhibit A at ¶¶ 28, 122.  ACM could only act through its corporate agents, executives and officers, and is responsible for their actions.  Homm, Ewing and other executives and employees of ACM only had access to the Funds' assets because of their positions with the Funds' Investment Manager, ACM.  The amended complaint in the New York Federal Action is thus a judicial admission of ACM's "brazen criminal fraud."

63.  ACM alleges and concedes in the Amended Complaint in the New York Federal Action that ACM's  Chairman, CEO, Chief Investment Officer and other officers directed the Funds to purchase "next-to-worthless securities" (Exhibit A at ¶ 32) at wildly exorbitant prices in U.S. shell companies after rapid trading **solely between the Funds themselves** gave the "false illusion of volume" and allowed ACM's personnel (and others) to "virtually make up prices as they went along, trading the securities between and among the Funds at higher and higher prices." *Id.* at ¶ 34.

64.  ACM alleges and admits in the New York Federal Action that ACM received "increased performance and management fees" due to the "grossly inflat[ed] prices of the Penny Stocks" with respect to every penny stock shell company that was part of the fraudulent scheme. *See, e.g., id.* at ¶ 92. In language that strikingly confirms exactly what Cascade first alleged in its initial Complaint commencing this case in June 2008, ACM and its Funds admit in the New York Federal Action that, as a result of the fact that the market value of the Penny Stocks was grossly inflated by means of the manipulation described herein, the NAV of the Funds increased significantly in the years 2006 and 2007, thereby increasing the actual amount of the two percent management fee paid to ACM and causing enormous performance fees to be paid to ACM. *Id.* at ¶ 142(d).

65.     ACM alleges and admits repeatedly in the New York Federal Action that its executives and officers illicitly took millions of dollars at the expense of the Funds (and, correspondingly, the Funds' shareholders such as Plaintiff and the members of the class).  *See, e.g., id.* at ¶¶ 42-43 (confessing that the illicit trading in one such stock alone created "a massive performance fee for ACM" and generated $29 million for the Individual Defendants and others); *id.* at ¶ 123 (confessing that ACM's trades pursuant to the fraudulent scheme resulted in losses of more than $195 million to Fund shareholders).

66.     ACM and the Funds allege and admit in the New York Federal Action that ACM's corporate agents, including its majority shareholder, Chairman, CEO and Chief Investment Officer acted with scienter in the fraudulent scheme regarding the eight penny stocks discussed by Cascade in June 2008.  *Id.* at ¶ 57 (ACM's executives made misstatements and omitted material facts regarding their fraudulent scheme in the penny stocks "with intent to defraud" and "with scienter"); *id.* at ¶162 (the Individual Defendants acted "with fraudulent intent and willful and reckless disregard for the interests of" the Funds); *id.* at ¶ 152(Homm "knowingly and willfully" failed to disclose his ownership in Hunter, his conflicts of interest and his bad faith, self-dealing investment management decisions); *id.* at ¶ 134 (ACM Chairman and CEO Ewing was told about the scheme by a whistleblower but worked with Homm to conceal the whistleblower's information).

67.     The Offering Memoranda for each of the Absolute Capital Funds disclosed none of the trading activities admitted by ACM and the Funds in the New York Federal Action, and correspondingly omitted to disclose the fraudulent scheme that came into existence no later than

September 2004 by which ACM, its executives and third parties defrauded the Funds, according to ACM's own admissions, of more than $195 million.

68.      Plaintiff hereby incorporates by reference the detailed descriptions of the fraudulent scheme, in the exact stocks previously identified by Cascade, as conceded by ACM in ¶¶ 24-121 (pp. 10-44) of Exhibit A.

**ABSOLUTE CAPITAL REPEATEDLY VIOLATED ITS "INVESTMENT OBJECTIVE AND STRATEGY," "INVESTMENT POLICIES AND PHILOSOPHY" AND "INVESTMENT RESTRICTIONS" AS REPRESENTED TO PLAINTIFF AND THE CLASS MEMBERS IN THE OFFERING MEMORANDA PREPARED AND DISTRIBUTED BY THE ACM DEFENDANTS**

69.      ACM and its Funds have filed suit in federal district court in New York in which they have confessed to virtually all material allegations made in support of Plaintiff's claims asserted herein against ACM.  The allegations made in the New York Federal Action show that ACM, acting through its chief executives and officers, made enormous investments in speculative U.S. penny stocks of shell companies that were directly contrary to numerous representations appearing in the Offering Memoranda for the Absolute Capital Funds prepared by the ACM Defendants and distributed to Plaintiff and the members of the Class for the purpose of inducing their investment in those Funds.

The Funds' "Investment Restrictions" were Misrepresented.

70.      The Offering Memorandum prepared by the ACM Defendants for the Return Europe Fund, dated January 1, 2004 and provided to Cascade in connection with its purchase of securities in the Return Europe Fund described certain "Investment Restrictions" applicable to the Fund, including the following: (a) "unlisted securities will be a maximum of 10% of the Net Asset Value of the Fund at the time of making the investment;" and (b) "no more than 20% of

the value of the gross assets (value at the time of making an investment) of the Fund may be

exposed to the creditworthiness or solvency of any one counterparty." The Offering

Memorandum prepared by the ACM Defendants for the East West Fund, dated June 24, 2005

and provided to Cascade in connection with its purchase of securities in the East West Fund, and

the Offering Memoranda for the European Catalyst Fund, and the Octane Fund contained these

same "Investment Restrictions," which were material considerations for potential investors.

71.     These representations regarding the composition of the Funds' investments were

false and misleading in that ACM's huge investments in thinly traded, illiquid U.S. penny stocks

that traded over the counter in the U.S. comprised substantially more than 10% of the Net Asset

Values of the Funds at all times during the Class Period, and these were investments in unlisted

securities as that term is commonly understood in the hedge fund industry. Further, the Funds'

holdings in these volatile, high-risk securities were made almost exclusively through Hunter, as

demonstrated by the subscription agreements with Hunter executed on behalf of the Funds by

ACM, such that substantially more than 20% of the value of the gross assets of the Funds were

exposed solely to the creditworthiness or solvency of Hunter as a counterparty to the

transactions. These investments posed precisely the risks carried by stocks not listed on an

exchange – they were thinly traded, highly volatile, illiquid, subject to manipulation, difficult to

price, and difficult to value for balance sheet purposes. The risks and dangers posed to the Funds

by the ACM Defendants' serial breaching of these "Investment Restrictions," were evidenced by

the plunge in the value of the Funds immediately upon disclosure of ACM's huge wagers on such

stocks. As alleged above, upon disclosure of the departures of Defendants Homm and Ewing in

September 2007, ACM publicly revealed that the Return Europe Fund had 35-40% of its assets

in illiquid, American penny stock securities while the East West Fund had 15-20% of its assets in

illiquid, American penny stock securities.

72.     That the trading practices used with the Absolute Capital Funds materially

differed from the "Investment Restrictions" in the Offering Memoranda stating that "unlisted

securities will be a maximum of 10% of the Net Asset Value of the Fund at the time of making

the investment" and that "no more than 20% of the value of the gross assets (value at the time of

making an investment) of the Fund may be exposed to the creditworthiness or solvency of any

one counterparty" was widely known throughout ACM as evidenced by (a) ACM's execution of

the subscription agreements with, and the substantial investments made in, The Hunter Fund

which had a high concentration of "restricted securities" having an "inherent uncertainty of

valuation;" (b) the numerous email communications between the majority of ACM employees

(including, but not limited to, Defendant Homm) and employees at Hunter related to the

substantial investments made by the Absolute Capital Funds in thinly traded, illiquid American

penny stocks such as Intermetro Communications, Inc., Java Detour, Inc., Logistical Support,

Inc., MicroMed Cardiovascular, Inc., and Pro Elite, Inc.; (c) Hunter's retention of sizeable cash

accounts on behalf of the Absolute Capital Funds to facilitate trading in the thinly traded, illiquid

American shell companies favored by Hunter;  (d) ACM's admissions in the New York Federal

Action that its Chairman, CEO, Chief Investment Officer and other employees were involved in

a fraudulent scheme for years predicated entirely on the ability to manipulate the markets for

unlisted and illiquid stocks that violated the Investment Restrictions; (e) ACM engaged in up to

one thousand trades involving unlisted securities and with Hunter as the counterparty; and (f)

the fact that, upon ACM's disclosure of the departures of Defendants Homm and Ewing in

September 2007, ACM also publicly revealed that the Return Europe Fund and the East West Fund had 35-40% and 15-20% of their assets, respectively, invested in illiquid, American penny stock securities of the type in which ACM had invested through Hunter.

73.     ACM, itself, confirmed the distinction between stocks listed on an exchange and stocks traded over the counter, the latter of which it represented would not exceed 10% of the Net Asset Value of each fund.  In its discussion in the Offering Memoranda of how Net Asset Value would be determined for each fund, ACM expressly differentiated between "investments that are listed on an exchange" and "investments traded over the counter."  The collapse of the Absolute Capital Funds and of ACM was caused by the investments in unlisted U.S. penny stocks that were directly contrary to the Funds' Investment Restrictions.

The Funds' Net Asset Values were Misrepresented.

74.     Accurate representations of Net Asset Values are particularly critical for hedge fund investors because such funds typically invest in alternative, derivative, and other investments that may be difficult to evaluate.  The Offering Memorandum for the Return Europe Fund represented how ACM, as Investment Manager, would make its "Determination of Net Asset Value" on behalf of that Fund.  The Offering Memorandum represented that investments traded over the counter, such as the U.S. penny stocks described above, "shall be valued at the last traded price on the date of determination . . . or at a price received from the counterparty to the over the counter trade."  **Under any circumstance, ACM represented that such stocks would be valued "at a fair price" so as to "reflect the fair value" of such investment.**  The Offering Memoranda for at least East West Fund, European Catalyst Fund, Octane Fund, and

Activist Fund contained the same representations regarding the Determination of Net Asset Value which was a material consideration for potential investors.

75.     The Investment Management Agreement between each fund and ACM similarly obligated ACM to determine accurately the Net Asset Value of each fund, typically on a monthly basis.

76.     The statements in the Offering Memoranda regarding the determination of Net Asset Value were false and misleading.  As the ACM Defendants then knew and intended, ACM, acting through its Chairman, CEO and Chief Investment Officer had put in place at least by September 2004 a scheme to make huge investments in U.S. shell companies purchased through a U.S. penny stock brokerage firm (*i.e.,* Hunter) predicated on misrepresenting the Net Asset Values of the U.S. penny stocks in shell companies.  The ACM Defendants egregiously and systematically inflated the Net Asset Value of the many U.S. penny stock investments made by ACM through the self-interested trading of Defendant Homm and other ACM officers and employees by carrying those investments on the Funds' balance sheets at their wildly inflated *cost* instead of their *fair value*, which was often far below their cost.  Moreover, to the extent those "costs" represented prices received from Hunter as a "counterparty" with respect to Homm's trades, those "costs," and the corresponding prices charged by Hunter, were grossly inflated.  The Offering Memoranda did not disclose that in thousands of trades involving U.S. stocks, the counterparty was either Hunter itself or was a "dummy counterparty."  Likewise, the Offering Memoranda did not disclose that, as confessed in the New York Federal Action, the counterparties were often other Absolute Capital Funds in transactions designed solely to create the appearance of trading activity and to "grossly inflate" the purported market price of the

stocks.  These sham purchases had the dual effect of (a) increasing the Net Asset Values of the Funds (producing inflated management fees to ACM from which all the Individual Defendants benefited); and (b) increasing the commissions received by Hunter (from which Homm directly benefited by virtue of his undisclosed ownership interest in Hunter).  Moreover, ACM's omissions identified above further rendered the statements in the Offering Memoranda regarding the determination of Net Asset Value to be false and misleading.

77.     ACM and the Absolute Capital Funds repeatedly concede in the New York Federal Action that the Net Asset Values of the Funds were greatly overstated and that ACM received increased performance and management fees by "grossly inflating" the price of its U.S. penny stocks and thus the Net Asset Values of the Funds.  *See, e.g.,* Exhibit A at ¶¶ 72, 83, 92, 104.

78.     The misrepresentations of the Net Asset Values of the Funds were continuously repeated in the ACM Defendants' public statements regarding the Funds' performance, in account statements prepared by, or at the direction of the ACM Defendants, and delivered to Plaintiff and members of the Class, and on ACM's web site which was available for public access.  In this manner, the Individual Defendants and ACM concealed the Funds' losses in U.S. penny stocks for years, the disclosure of which would have halted further subscriptions to the Funds.

79.     That the valuation practices used with the Absolute Capital Funds materially differed from the representations in the Offering Memoranda assuring that the Net Asset Value for the Funds would be calculated so as to "reflect the fair value" of the investments was known throughout ACM as evidenced by (a) the numerous emails and correspondence between ACM employees and Hunter that confirmed to ACM's financial analysts that ACM was investing the

Funds' capital in U.S. penny stocks that were inherently difficult to value by any "mark to market" or other generally accepted valuation metric, and (b) the description in the draft financial statements for The Hunter Fund that Hunter shared with ACM stating that nearly 75% of the investments in The Hunter Fund were in "restricted securities" having an "inherent uncertainty of valuation," and (c) ACM's admissions in the New York Federal Action that its Chairman, CEO, Chief Investment Officer and other employees were involved in a fraudulent scheme for years predicated entirely on the ability to manipulate the markets for unlisted and illiquid stocks that grossly inflated the Net Asset Values of the Funds.

80.     The extent of the deception in this regard, and its impact on the Funds' investors, are reflected in the steep drop in the Funds' values immediately after ACM's practice of carrying the U.S. penny stocks at grossly inflated valuations was revealed in September 2007.  When the unlisted stocks were re-valued to their market value, the Funds plunged by up to 40% – causing hundreds of millions of dollars in losses virtually overnight.  The collapse of the Absolute Capital Funds and of Defendant ACM was attributable in significant part to ACM's misrepresentations of the fair values of the U.S. penny stocks.

The Funds' "Investment Objective and Strategy" were Misrepresented.

81.     The Offering Memorandum prepared by the ACM Defendants for the Return Europe Fund, dated January 1, 2004 and provided to Cascade in connection with its purchase of securities in the Return Europe Fund, described that Fund's "Investment Objective and Strategy" as follows: "the Fund currently intends to invest principally in long and short positions in European equities and securities."  The Offering Memorandum for the Return Europe Fund also assured Cascade and other potential investors that "[t]he principal objectives and policy of the

Fund will be adhered to for at least three years from the commencement of operations, other than in exceptional circumstances and then only with the consent of the majority of the shareholders." These representations as to the nature and term of the Return Europe Fund's investment objectives were material to investors and were consistent with the purported European expertise of Defendant Homm and the other European founders and directors of ACM.

82.     Similarly, the Offering Memorandum prepared by the ACM Defendants for the East West Fund, dated June 24, 2005 and provided to Cascade in connection with its purchases of securities in the East West Fund, described that Fund's "Investment Objective and Strategy" to include the following:  "The Fund intends to focus principally on the old and new European Union members as well as potential EU candidates and their neighbors."  Equally similarly, the Offering Memorandum for the East West Fund further assured Cascade and other potential investors that "[t]he principal objectives and policy of the Fund will be adhered to for at least three years from the date of listing, other than in exceptional circumstances and then only with the consent of the majority of the Shareholders."  These representations as to the nature and term of the East West Fund's investment objectives were material to investors and were consistent with the purported European expertise of Defendant Homm and the other European founders and directors of ACM.

83.     Likewise, the Offering Memorandum for the European Catalyst Fund described that Fund's "Investment Objective and Strategy" to include the following:  "the Fund currently intends to invest principally in under and overvalued long and short positions in European equities and securities."  This representation of the European Catalyst Fund's investment

objective was material to investors and was consistent with the purported European expertise of Homm and the other European founders and directors of ACM.

84.     These statements of "Investment Objectives and Strategy" in the Funds' Offering Memoranda prepared by the ACM Defendants were false and misleading.  As the ACM Defendants then knew and intended, ACM, acting through its Chairman, CEO and Chief Investment Officer, had put in place at least by September 2004 a scheme to make huge investments in U.S. shell companies purchased through a U.S. penny stock brokerage firm (*i.e.,* Hunter) that had little or nothing to do with European equities or with old and new European Union members as represented in the Offering Memoranda.  The collapse of the Absolute Capital Funds and ACM was caused primarily by the disclosure that, contrary to the representations contained in the Offering Memoranda regarding the Funds' Investment Objectives and Policies and their focus on European equities and securities and European countries, the Funds, at the direction of the ACM Defendants, had made large investments in speculative and thinly-traded U.S. penny stocks.

85.     That the actual trading practices used with the Absolute Capital Funds materially differed from the representations in the Offering Memoranda that  "the Fund currently intends to invest principally in long and short positions in European equities and securities" (the Return Europe Fund) or that "[t]he Fund intends to focus principally on the old and new European Union members as well as potential EU candidates and their neighbors" (East West Fund) was widely known throughout ACM as evidenced by (a) ACM's execution of the subscription agreements with, and the substantial investments made in, The Hunter Fund which had a high concentration of "restricted securities" in U.S. penny stocks having an "inherent uncertainty of

valuation;" (b) the numerous email communications between various ACM employees (including, but not limited to, Defendant Homm) and employees at Hunter related to the substantial investments made by the Absolute Capital Funds in thinly traded, illiquid American penny stocks such as Intermetro Communications, Inc., Java Detour, Inc., Logistical Support, Inc., MicroMed Cardiovascular, Inc., and Pro Elite, Inc.; (c) Hunter's retention of sizeable cash accounts on behalf of the Absolute Capital Funds, including the Return Europe Fund and the East West Fund in which Cascade invested, to facilitate trading in the thinly traded, illiquid American penny stocks favored by Hunter;  (d) ACM's admissions in the New York Federal Action that its Chairman, CEO, Chief Investment Officer and other employees were involved in a fraudulent scheme for years predicated entirely on the ability to manipulate the markets for the eight U.S. unlisted and illiquid stocks that violated the Investment Objectives; (e) ACM made thousands of trades in U.S. stocks for the Funds; and (f) the fact that, upon ACM's disclosure of the departures of Defendants Homm and Ewing in September 2007, ACM also publicly revealed that the Return Europe Fund and the East West Fund had 35-40% and 15-20% of their assets, respectively, invested in illiquid, American penny stock securities of the type in which ACM had invested through Hunter.  As evidenced by extensive email communication and ACM's admissions in the New York Federal Action, the pervasive securities trading between Hunter and ACM involved both Defendant Homm and the majority of ACM's employees, and required almost daily communication with Hunter employees.

86.     Each of these misrepresentations appearing in the Offering Memoranda was perpetuated by defendant ACM and by the Individual Defendants from the inception of the Class Period until September 2007.  Throughout years of soliciting investments and of reporting the

Funds' investment activities to shareholders like Plaintiff and the members of the Class, the

ACM Defendants perpetuated their misrepresentations regarding the Funds' investment

restrictions, net asset values, and policies and objectives.

**ACM TRANSFERRED NEARLY ALL OF ITS ASSETS TO DEFENDANT ARGO GROUP LIMITED TO TRY TO INSULATE THOSE ASSETS FROM CREDITORS, INCLUDING CASCADE AND MEMBERS OF THE CLASS**

87.     In January 2007, ACM acquired and merged with Argo Capital Management and

other entities within the Argo family of businesses for approximately $100 million.  The Argo

businesses that ACM acquired managed certain hedge funds that focused on debt securities, with

a further focus on emerging market debt.  The Argo businesses acquired by ACM managed

approximately $900 million of assets in various funds.

88.     ACM and Argo merged for the purpose of combining ACM's equity hedge fund

business with Argo's debt hedge fund business. ACM publicly claimed a "successful integration"

between ACM's investment management business and the Argo Division emerging market

expertise while noting that "[t]he successful integration of Argo Capital Management, acquired

in January 2007, added significant product diversification."

89.      Argo's largest shareholders were Andreas and Kyriakos Riales, brothers who

became ACM's largest individual shareholders after the merger.  As part of the merger, Andreas

Riales became "Co-chief Investment Officer" of the Absolute Capital Funds at issue in this case.

The other Co-chief Investment Officer of the Absolute Capital Funds was Florian Homm.

90.     After the September 2007 disclosure of ACM's fraudulent scheme described

above, which had continued throughout 2007, the Argo businesses became ACM's most valuable

assets.  ACM knew defrauded investors could seek relief from ACM, which would expose

ACM's Argo assets to the claims of investors.  As a result, ACM undertook to shield its assets from investors in the Absolute Capital Funds.

91.     In February 2008 – a few months after Homm and ACM's fraudulent investment scheme became public – a new entity called Argo Group Limited ("Argo Group") was formed in the Isle of Man.  At that time, ACM characterized Argo Group as "a wholly-owned subsidiary of Absolute Capital incorporated in the Isle of Man …"  ACM knew of the fraudulent activity by its Chairman, CEO, Chief Investment Officer and other employees that ACM has since admitted in the New York Federal Action and knew it faced securities fraud liability for that fraudulent activity.  Argo Group was formed for the sole purpose of divesting ACM of its most valuable remaining assets – the Argo businesses.

92.      On April 29, 2008, ACM and its new subsidiary entered into a Sale Agreement whereby ACM transferred its entire share capital of its Argo Division companies to its newly-formed, wholly-owned subsidiary Argo Group in exchange for Argo Group's common stock.  In May 2008, ACM agreed to distribute to its shareholders the common stock of the new Argo Group, which common stock ACM had received only days before when it transferred its Argo Division assets to the new entity.  In this fashion, the newly created shares of Argo Group were distributed in-kind to the shareholders of ACM.  (The creation of Argo Group, the transfer of ACM's Argo business to the new Argo Group in exchange for Argo Group's stock, and the subsequent distribution of Argo Group stock to ACM's shareholders is referred to hereafter as "the Argo Spinoff" or "the Spinoff.")

93.     As part of the Spinoff, ACM agreed to provide "administrative and commercial services" to Argo Group even after the Spinoff.  To facilitate those services, Argo Group

committed to provide ACM "full and free access" to Argo Group's premises and to provide

ACM management such office space and secretarial support as ACM may need.  The "company

secretary" of Argo Group fills the same position with ACM, and both ACM and Argo Group use

the same "advisor and stockbroker."  The governing documents for the Argo Spinoff disclose

that all the directors of the newly formed Argo Group Limited were directors of ACM.

94.     As of June 2008, ACM's ownership of Argo Capital and the related Argo entities

was far and away ACM's most valuable asset.  The intent behind, and the consequence of, the

Argo Spinoff was to shield ACM's largest asset from the exposure ACM faced – and knew it

faced – as a result of the fraudulent penny stock scheme described above and admitted in the

New York Federal Action.

95.     The market price of ACM stock collapsed promptly upon shareholder approval of

the Argo Spinoff, **falling more than 80%, and reflecting the investment public's**

**understanding that the value of ACM resided principally in the assets transferred to Argo**

**Group in the Argo Spinoff.**  The financial press reported the immediate post-Spinoff collapse

of ACM's already battered stock price to be "a sign that [ACM]'s value lay mostly or wholly in

the Argo fund management business and very little if at all in the battered original hedge fund

activity."  The vast majority of ACM's revenue-generating assets were transferred to Argo Group

via the Argo Spinoff and, as a direct result of the Argo Spinoff, ACM virtually became a penny

stock itself.

96.     The Argo Spinoff altered the form of ownership of Argo Capital and the related

Argo entities, but not its substance.  Pursuant to the Argo Spinoff, and as ACM publicly

admitted, ACM shareholders "received the same number of Ordinary Shares in Argo Group

Limited" as they owned in ACM.   Thus, Defendant Argo Group Limited was created "with the same shareholder base," allowing ACM's shareholders to "retain[] their existing holding of Ordinary Shares in ACM" and at the same time receive parallel ownership of Argo Group Limited.  In other words, Argo Group ultimately became an entity that was owned independently, "albeit by the same shareholders in the same proportions as Absolute Capital." The Riales brothers became the largest shareholders of Argo Group just as they were the largest shareholders of ACM.  ACM did not split itself into two entities owned by the same shareholders in 2008 until *after* it incurred liability to Plaintiff and the members of the Class for the securities fraud that was exposed in late 2007.

97.     Like the market in general, ACM recognized that the Spinoff had transferred most or all of ACM's assets to Argo Group.  ACM issued financial statements for the period ended June 30, 2008 – barely two weeks after the Spinoff.  In connection with those financial statements, ACM's independent auditors, Deloitte & Touche, noted that in light of ACM's massive investments in illiquid American penny stocks, "adversely affected parties may consider and or commence litigation against" ACM.   (In fact, Cascade had already filed this action.)  Yet ACM made "no provision for any liability that may ultimately arise …"

98.     To the contrary, since ACM had just transferred virtually all of its assets to Argo Group, Deloitte & Touche opined that the risk of successful litigation against ACM arising from Homm's investment activities "may cast significant doubt about [ACM's] ability to continue as a going concern."

99.     In turn, ACM conceded in its financial statements that ACM "may not have adequate resources to defend these claims or settle any successful claims which may arise.  In such circumstances, *the company would cease to be a going concern"* (emphasis added).

100.    Approximately six months after the Spinoff, Argo Group applied to have its shares traded publicly on the AIM exchange in London, England.  In its application, Argo Group specifically recognized and acknowledged that Argo Group "could become involved in disputes and/or claims . . . arising out of its historic connection with Absolute Capital."

101.    Despite ACM's attempt to shield its assets from its defrauded investors, including Plaintiff and the members of the Class, Argo Group is the successor in liability to ACM, from which it was spawned.

102.    When Argo Group received 80% or more of ACM's net worth in the form of ACM's ownership of Argo Capital and related Argo entities, Argo Group was the recipient of a fraudulent transfer of ACM's assets undertaken to shield ACM's assets from the victims of Defendants' fraudulent scheme in U.S. penny stocks of shell companies.

103.    Argo Group is liable as the successor to ACM because Argo Group is a mere continuation of ACM.

104.    Argo Group is liable as the successor to ACM because it is the intended product of the *de facto* merger of Argo Group and ACM.

## ALLEGATIONS OF SCIENTER

105.    ACM and the Individual Defendants acted with intent to defraud, or with reckless disregard for the truth, in deceiving Plaintiff and the members of the Class about their scheme to

profit at the Funds' expense by investing Funds' assets in unlisted U.S. penny stocks through

Hunter, as shown by and reasonably inferred from the following:

(1)     ACM and the Funds admitted and alleged in the New York Federal Action

        commenced in late 2009 that ACM's Chairman, CEO, Chief Investment Officer and

        other employees acted with scienter and intent to defraud in their scheme involving

        the eight U.S. penny stocks that are at the heart of this action.

(2)     The specific allegations made by ACM and the Funds regarding the fraudulent

        scheme in the New York Federal Action.  Exhibit A at ¶¶24-121.

(3)     As admitted and alleged in the New York Federal Action, ACM and its Chairman,

        CEO, Chief Investment Officer and other employees made enormous illicit profits

        as a direct result of the fraudulent scheme involving Hunter and the "grossly

        inflated" U.S. penny stocks, including "massive performance fees for ACM."

        Exhibit A at 17.

(4)     ACM, through its majority owner and Chief Investment Officer Homm, and its

        Chairman and CEO Ewing, knew of the fraudulent scheme with Hunter that began

        at least by September 2004 and the enormous profits it generated for ACM and the

        Individual Defendants.  Nevertheless, ACM concealed the scheme from Plaintiff

        and members of the Class and omitted to disclose the scheme in any Offering

        Memoranda, which were prepared and distributed by ACM and the Individual

        Defendants, and concealed the disciplinary history of Ficeto, with whom ACM was

        conducting hundreds of millions of dollars of trades.

(5)   ACM, through at least its majority owner and Chief Investment Officer, knew of Homm's undisclosed half-ownership in Hunter, the undisclosed and insurmountable conflict of interest created by that ownership, and the undisclosed enormous profits ACM generated for Homm through the penny stock scheme with Hunter.  ACM, through Homm, intended to deceive Plaintiff and members of the class by concealing this information because ACM, by and through Homm, recognized that the fraudulent scheme with Hunter was a material circumstance likely to dissuade potential investors from investing in the Funds.

(6)   As admitted and alleged by ACM and the Funds in the New York Federal Action, ACM's Chairman, CEO, Chief Investment Officer and other employees caused the Funds to trade the U.S. penny stocks amongst themselves solely for the purpose of creating the "false illusion of volume" in the penny stocks' trading that allowed them to extract enormous "trading" commissions and "to virtually make up prices as they went along."  Exhibit A at ¶ 34.  Such intra-fund trading to create the illusion of market activity and generate false commissions cannot be done *without* intent to deceive.

(7)   ACM, through its CEO and Chief Investment Officer, concealed information from a whistleblower concerning the fraud being perpetrated through Hunter and the Funds' investments in U.S. penny stocks.

(8)   ACM, through its Chairman, CEO, Chief Investment Officer and other employees, knew the counterparty for thousands of trades in U.S. stocks was either its partner in ACM's fraudulent scheme (Hunter) or was a "dummy counterparty", and knew

many trades were false intra-Funds trades designed solely to "grossly inflate" the prices of the U.S. stocks, yet nevertheless carried those stocks in the Funds' Net Asset Values at the "grossly inflated" purchase prices.

(9)     The financial statements for ACM for the period ending 12/31/2005 identify the company as having 20 employees.  Upon information and belief formed from reviewing numerous electronic mail communications between ACM and Hunter, at least 13 separate ACM employees, including each of the Individual Defendants, are identified on communications with Hunter that relate to penny stock transactions of the type identified by ACM in the New York Federal Action as fraudulent, demonstrating that the majority of ACM's employees were aware of and participated in the fraudulent scheme.

(10)    Homm suddenly resigned in September 2007 and went into hiding.  His whereabouts are unknown and remain subject to speculation.  Homm's actions as a fugitive strongly imply scienter on his part.

(11)    Both ACM's independent accountant (Ernst & Young) and its Fund administrator (Fortis) resigned in the immediate aftermath of the September 2007 disclosure of ACM's fraudulent investments in U.S. penny stocks.

(12)    ACM is responsible for the actions of its corporate agents, including its Chairman, CEO, majority owner, Chief Investment Officer and other employees, and the scienter of those persons is attributable to ACM.

106.    ACM and the Individual Defendants acted with intent to defraud, or with reckless disregard for the truth, in deceiving Plaintiff and the members of the Class about the Net Asset

Values of the Funds and how they would be calculated, as shown by and reasonably inferred from the following:

(1)     ACM and the Funds admitted and alleged in the New York Federal Action commenced in late 2009 that ACM's Chairman, CEO, Chief Investment Officer and other employees acted with scienter and intent to defraud in their scheme involving the eight U.S. penny stocks that are at the heart of this action.

(2)     The specific allegations made by ACM and the Funds regarding the impact of the fraudulent scheme on the Funds' Net Asset Values in the New York Federal Action. Exhibit A at ¶¶24-121.

(3)     As admitted and alleged in the New York Federal Action, ACM and its Chairman, CEO, Chief Investment Officer and other employees made enormous illicit profits as a direct result of the fraudulent scheme involving Hunter and the "grossly inflated" U.S. penny stocks, including "massive performance fees for ACM." Exhibit A at 17.  The illegal profits and massive performance fees would have been diminished if ACM had not misrepresented how Net Asset Values would be determined.

(4)     ACM, through its majority owner and Chief Investment Officer Homm, and its Chairman and CEO Ewing, knew of the fraudulent scheme with Hunter that began at least by September 2004 and the enormous profits it generated for ACM and the Individual Defendants.  Nevertheless, ACM concealed the scheme from Plaintiff and members of the Class and omitted to disclose the scheme in any Offering Memoranda, which were prepared and distributed by ACM and the Individual

Defendants, and concealed the disciplinary history of Ficeto, with whom ACM was conducting hundreds of millions of dollars of trades.

(5)   ACM, through at least its majority owner and Chief Investment Officer, knew of Homm's undisclosed half-ownership in Hunter, the undisclosed and insurmountable conflict of interest created by that ownership, and the undisclosed enormous profits ACM generated for Homm through the penny stock scheme with Hunter.  ACM, through Homm, intended to deceive Plaintiff and members of the class by concealing this information because ACM, by and through Homm, recognized that the fraudulent scheme with Hunter was a material circumstance likely to dissuade potential investors from investing in the Funds.

(6)   As admitted and alleged in the New York Federal Action, ACM's Chairman, CEO, Chief Investment Officer and other employees caused the Funds to trade the U.S. penny stocks amongst themselves solely for the purpose of creating the "false illusion of volume" in the penny stocks' trading that allowed them to extract enormous "trading" commissions and "to virtually make up prices as they went along."  Exhibit A at 13.  Such intra-fund trading to create the illusion of market activity and generate false commissions cannot be done *without* intent to deceive.

(7)   Numerous emails and correspondence between several ACM employees and Hunter confirmed to ACM's financial analysts that ACM was investing the Funds' capital in U.S. penny stocks that were inherently difficult to value by any "mark to market" or other generally accepted valuation metric, and the draft financial statements for

The Hunter Fund informed ACM that nearly 75% of the investments in The Hunter Fund were in "restricted securities" having an "inherent uncertainty of valuation."

(8)   ACM, through its Chairman, CEO, Chief Investment Officer and other employees, knew the counterparty for thousands of trades in U.S. stocks was its partner in ACM's fraudulent scheme (Hunter) or was a "dummy counterparty", and knew many trades were false intra-Funds trades designed solely to "grossly inflate" the prices of the U.S. stocks, yet nevertheless carried those stocks in the Funds' Net Asset Values at the "grossly inflated" purchase prices.   ACM intended to deceive Plaintiff and members of the Class by concealing this information because ACM recognized that the fraudulent scheme with Hunter of inflating Net Asset Values was a material circumstance likely to dissuade potential investors from investing in the Funds.

(9)   The financial statements for ACM for the period ending 12/31/2005 identify the company as having 20 employees.  Upon information and belief formed from reviewing numerous electronic mail communications between ACM and Hunter, at least 13 separate ACM employees, including each of the Individual Defendants, are identified on communications with Hunter that relate to penny stock transactions of the type identified by ACM in the New York Federal Action as fraudulent, demonstrating that the majority of ACM's employees were aware of and participated in the fraudulent scheme.

(10) Homm suddenly resigned in September 2007 and went into hiding.  His

whereabouts are unknown and remain subject to speculation.  Homm's actions as a

fugitive strongly imply scienter on his part.

(11) Both ACM's independent accountant (Ernst & Young) and its Fund administrator

(Fortis) resigned in the immediate aftermath of the September 2007 disclosure of

ACM's fraudulent investments in U.S. penny stocks.

(12) ACM is responsible for the actions of its corporate agents, including its Chairman,

CEO, Chief Investment Officer and other employees, and the scienter of those

persons is attributable to ACM.

107.    ACM and the Individual Defendants acted with intent to defraud, or with reckless

disregard for the truth, in representing in the "Investment Restrictions" in the Offering

Memoranda that "unlisted securities will be a maximum of 10% of the Net Asset Value of the

Fund at the time of making the investment" and that "no more than 20% of the value of the gross

assets (value at the time of making an investment) of the Fund may be exposed to the

creditworthiness or solvency of any one counterparty," as shown by and reasonably inferred

from the following:

(1) ACM and the Funds admitted and alleged in the New York Federal Action

commenced in late 2009 that ACM's Chairman, CEO, Chief Investment Officer and

other employees acted with scienter and intent to defraud in their scheme involving

the eight U.S. penny stocks that are at the heart of this action.

(2)     The specific allegations made by ACM and the Funds regarding the extent of the illiquid stocks held by the Funds in the New York Federal Action.  Exhibit A at ¶¶24-121.

(3)     As admitted and alleged in the New York Federal Action, ACM and its Chairman, CEO, Chief Investment Officer and other employees made enormous illicit profits as a direct result of the fraudulent scheme involving Hunter and the "grossly inflated" U.S. penny stocks, including "massive performance fees for ACM." Exhibit A at 17.  The illegal profits and massive performance fees would have been diminished if ACM honored the 10% restriction on unlisted securities upon which the scheme was based.

(4)     ACM, through at least its majority owner and Chief Investment Officer, knew of Homm's undisclosed half-ownership in Hunter, the undisclosed and insurmountable conflict of interest created by that ownership, and the undisclosed enormous profits ACM generated for Homm through the penny stock scheme with Hunter.  ACM, through Homm, intended to deceive Plaintiff and members of the class by concealing this information because ACM, by and through Homm, recognized that the fraudulent scheme with Hunter would be impaired if ACM limited the unlisted securities in each fund to a maximum of 10%.

(5)     Numerous emails and correspondence between several ACM employees and Hunter confirmed to ACM's financial analysts that ACM was investing the Funds' capital in U.S. penny stocks that were inherently difficult to value by any "mark to market" or other generally accepted valuation metric, and the draft financial statements for

The Hunter Fund informed ACM that nearly 75% of the investments in The Hunter Fund were in "restricted securities" having an "inherent uncertainty of valuation."

(6)   Numerous email communications between various ACM employees (including, but not limited to, Homm) and employees at Hunter related to the substantial investments made by the Absolute Capital Funds in the thinly traded, illiquid American penny stocks described above.

(7)   ACM, through its Chairman, CEO, Chief Investment Officer and other employees, knew the counterparty for thousands of trades in U.S. stocks was its partner in ACM's fraudulent scheme (Hunter) or was a "dummy counterparty", and knew many trades were false intra-Funds trades designed solely to "grossly inflate" the prices of the U.S. stocks beyond the 10% limit for unlisted stocks.

(8)   Hunter's retention, with the acquiescence of ACM, of sizeable cash accounts on behalf of the Absolute Capital Funds to facilitate trading in the thinly traded, illiquid American penny stocks that were integral to the scheme.

(9)   The financial statements for ACM for the period ending 12/31/2005 identify the company as having 20 employees.  Upon information and belief formed from reviewing numerous electronic mail communications between ACM and Hunter, at least 13 separate ACM employees, including each of the Individual Defendants, are identified on communications with Hunter that relate to penny stock transactions of the type identified by ACM in the New York Federal Action as fraudulent, demonstrating that the majority of ACM's employees were aware of and participated in the fraudulent scheme.

(10)   Homm suddenly resigned in September 2007 and went into hiding.  His
       whereabouts are unknown and remain subject to speculation.  Homm's actions as a
       fugitive strongly imply scienter on his part.

(11)   ACM publicly disclosed and admitted that, as of September 2007, Return Europe
       Fund (35-40%), Octane Fund (40-45%),European Catalyst (25-30%), East West
       Fund (15-20%) and Activist Fund (10-15%) all invested in illiquid, American
       penny stock securities far in excess of the Investment Restrictions for such stocks.

(12)   ACM is responsible for the actions of its corporate agents, including its Chairman,
       CEO, Chief Investment Officer and other employees, and the scienter of those
       persons is attributable to ACM.

108.    ACM and the Individual Defendants acted with intent to defraud, or with reckless
disregard for the truth, in representing in the Offering Memoranda that  "the Fund currently
intends to invest principally in long and short positions in European equities and securities" (the
Return Europe Fund) or that "[t]he Fund intends to focus principally on the old and new
European Union members as well as potential EU candidates and their neighbors" (East West
Fund) as shown by and reasonably inferred from the following:

(1)   ACM and the Funds admitted and alleged in the New York Federal Action
      commenced in late 2009 that ACM's Chairman, CEO, Chief Investment Officer and
      other employees acted with scienter and intent to defraud in their scheme involving
      the eight U.S. penny stocks that are at the heart of this action.

(2)   The specific allegations made by ACM and the Funds regarding the extent of the illiquid stocks held by the Funds in the New York Federal Action.  Exhibit A at ¶¶24-121.

(3)   As admitted and alleged in the New York Federal Action, ACM and its Chairman, CEO, Chief Investment Officer and other employees made enormous illicit profits as a direct result of the fraudulent scheme involving Hunter and the "grossly inflated" U.S. penny stocks, including "massive performance fees for ACM." Exhibit A at 17.  The illegal profits and massive performance fees would have been diminished if ACM honored the Investment Objectives because they were inconsistent with the unlisted U.S. penny stocks upon which the scheme was based.

(4)   ACM, through at least its majority owner and Chief Investment Officer, knew of Homm's undisclosed half-ownership in Hunter, the undisclosed and insurmountable conflict of interest created by that ownership, and the undisclosed enormous profits ACM generated for Homm through the penny stock scheme with Hunter.  ACM, through Homm, intended to deceive Plaintiff and members of the class by concealing this information because ACM, by and through Homm, recognized that the fraudulent scheme with Hunter would be impaired if ACM had invested in stocks with a European focus.

(5)   Numerous emails and correspondence between several ACM employees and Hunter confirmed to ACM's financial analysts that ACM was investing the Funds' capital in U.S. penny stocks, not European stocks, and the draft financial statements for The Hunter Fund informed ACM that nearly 75% of the investments in The Hunter

Fund were in U.S. "restricted securities" having an "inherent uncertainty of valuation," not in European stocks.

(6)   Numerous email communications between various ACM employees (including, but not limited to, Homm) and employees at Hunter related to the substantial investments made by the Absolute Capital Funds in the thinly traded, illiquid American penny stocks described above, not European stocks.

(7)   Hunter's retention, with the acquiescence of ACM, of sizeable cash accounts on behalf of the Absolute Capital Funds to facilitate trading in the thinly traded, illiquid American penny stocks that were integral to the scheme.

(8)   As alleged and admitted in the New York Federal Action, Ewing took steps specifically designed to conceal ACM's investments in American stocks.  Exhibit A at ¶49.

(9)   The financial statements for ACM for the period ending 12/31/2005 identify the company as having 20 employees.  Upon information and belief formed from reviewing numerous electronic mail communications between ACM and Hunter, at least 13 separate ACM employees, including each of the Individual Defendants, are identified on communications with Hunter that relate to penny stock transactions of the type identified by ACM in the New York Federal Action as fraudulent, demonstrating that the majority of ACM's employees were aware of and participated in the fraudulent scheme that did not consist of European stocks.

(10) Homm suddenly resigned in September 2007 and went into hiding.  His whereabouts are unknown and remain subject to speculation.  Homm's actions as a fugitive strongly imply scienter on his part.

(11) ACM publicly disclosed and admitted that, as of September 2007, Return Europe Fund (35-40%), Octane Fund (40-45%),European Catalyst (25-30%), East West Fund (15-20%) and Activist Fund (10-15%) all invested in illiquid, American penny stock securities, not European stocks.

(12) ACM is responsible for the actions of its corporate agents, including its Chairman, CEO, Chief Investment Officer and other employees, and the scienter of those persons is attributable to ACM.

109.    As to each misrepresentation and omission alleged, ACM and the Individual Defendants had the motive and opportunity to perpetrate the fraudulent scheme described herein because the Individual Defendants were the Chairman, CEO, Chief Investment Officer and majority owners of ACM.   In turn, ACM controlled the Funds.  ACM and the Individual Defendants had exclusive authority to manage the business affairs of the Funds, and were directly responsible for the investment activities conducted by the Funds.  Consequently, ACM and each of the Individual Defendants knew and intended that the assets held by the Funds were not invested in accordance with the representations contained in the Offering Memoranda and were not carried at fair value for purposes of determining the Funds' Net Asset Values.  As repeatedly confessed in the New York Federal Action, ACM's "Management Fees" and "Performance Fees" were continuously and "massively" overstated by the systematic exaggeration of the Net Asset Values of the Funds.  Defendant Homm "earned" substantial

personal income through these secret and fraudulent dealings with Hunter World Markets, and the other ACM Defendants all profited from the excessive fees generated by the falsely inflated Net Asset Values.

## LOSS CAUSATION

110.    During the Class Period as detailed herein, the ACM Defendants engaged in the above-described scheme to deceive investors in the Funds that operated as a fraud or deceit on investors who purchased interests in the Funds by misrepresenting the self-dealing, investment restrictions, objectives, and net asset valuations of the Funds.

111.    The decline in the value of the assets of the Funds resulted directly from the disclosure that a substantial amount of the assets of the Funds had not been invested in the manner represented in the Offering Memoranda but, instead, had been invested in thinly traded, illiquid U.S. penny stocks that traded over the counter in the U.S. and that had been grossly overvalued by the ACM Defendants in computing the Net Asset Values of the Funds.

112.    The decline in the value of the assets of the Funds was a direct result of the ACM Defendants' fraudulent conduct alleged herein finally being disclosed to the Funds' investors and to the market.

113.    The resulting decline in the value of the assets of the Funds was foreseeable to the ACM Defendants at the time of the ACM Defendants' misrepresentations and omissions of material facts.

114.    The totality of the circumstances surrounding the decline in the value of the assets of the Funds negates any inference that the economic loss suffered by Plaintiff and the other members of the Class was caused by any factors unrelated to the ACM Defendants' fraudulent

conduct.  As admitted by ACM and the Funds in the New York Federal Action, the fraudulent

scheme executed by ACM's majority owner, Chairman, CEO, Chief Investment Officer and

other employees caused the losses incurred by the Funds, and thus by Plaintiff and members of

the Class.

115.    The economic loss sustained by Plaintiff and the members of the Class was the

direct and proximate result of the ACM Defendants' fraudulent scheme and course of conduct in

investing the assets of the Funds into thinly traded, illiquid U.S. penny stocks that traded over the

counter in the U.S. and in repeatedly grossly overstating the Net Asset Value of the Funds'

investments to mislead investors as to the value of the assets of the Funds.

## NO SAFE HARBOR

116.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

None of the specific statements pleaded herein were identified as "forward-looking statements"

when made.  To the extent there were any forward-looking statements, there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ

materially from those in the purportedly forward-looking statements.  Alternatively, to the extent

that the statutory safe harbor does apply to any forward-looking statements, the particular

speaker knew that the particular forward-looking statement was false, and/or the forward-looking

statement was authorized and/or approved by a Defendant who knew that those statements were

false when made.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of

the Federal Rules of Civil Procedure on behalf of a class consisting of:

> All United States investors and foreign investors controlled or
> advised by United States residents who purchased shares or limited
> partnership interests in the Absolute Return Europe Fund, the
> Absolute East West Fund Limited, the Absolute East West Fund,
> L.P., the Absolute European Catalyst Fund, the Absolute Octane
> Fund Limited, the Absolute Octane Fund L.P., the Absolute
> Activist Fund, the Absolute Germany Fund Limited or the
> Absolute India Fund Limited on or after January 1, 2004 and who
> held their investments on September 18, 2007 (the "Class Period");
> excluding, however, defendants or any members of their
> immediate families, or their heirs, successors, and assigns, and also
> excluding the officers, directors, agents, partners, employees or
> predecessors or successors in interest of any defendant.

118.    The members of the class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

Plaintiff believes that the members of the Class are geographically dispersed throughout the

United States.  The precise number of Class members exceeds eighty and can be ascertained

through discovery of the books and records of the Funds that are maintained by Defendants.

119.    Common questions of law or fact exist as to all members of the Class and

predominate over any questions affecting solely individual Class members.  Among the

questions of law or fact common to the Class are:

(a)    Whether the federal securities laws were violated by the ACM Defendants' acts as
alleged herein;

(b)    Whether the ACM Defendants disseminated false and misleading statements in
the Offering Memoranda concerning the "Investment Restrictions" and
"Investment Objective and Strategy" of the Funds and the manner by which the
Net Asset Value of the Funds would be determined;

58

(c)     Whether the ACM Defendants violated (i) the "Investment Restrictions" contained in the Offering Memoranda, (ii) the "Investment Objective and Strategy" contained in the Offering Memoranda; or (iii) the Determination of Net Asset Value as described in the Offering Memoranda;

(d)     Whether the ACM Defendants omitted material facts by failing to disclose Defendant Homm's relationship with Hunter World Markets and Ficeto, and by not disclosing Homm's use of Plaintiff's funds to generate secret profits for Hunter and himself;

(e)     Whether the ACM Defendants employed a device, scheme, or artifice to defraud by using the funds invested by Plaintiff and the Class members to generate secret profits for Hunter World Markets and for Defendant Homm;

(f)     Whether the ACM Defendants acted knowingly or recklessly in issuing the Offering Memoranda that contained material misrepresentations of fact and omitted facts material to an investment in the Funds;

(g)     Whether the members of the Class have sustained damages and, if so, the proper measure of damages; and

(h)     Whether the large investments by the Funds in thinly traded, illiquid U.S. penny stocks caused losses to Plaintiff and the Class.

120.    Plaintiff is a member of the Class and Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and the Class members have sustained damages arising out of the ACM Defendants' wrongful conduct in violation of federal law as complained of herein. Plaintiff and the members of the Class received similar misrepresentations and omissions during the Class Period, and all were injured by ACM's accumulation of investments in U.S. penny stocks and the collapse in Fund prices that occurred when Defendant Homm suddenly resigned in September 2007 at the time that the Funds' heavy concentration in illiquid U.S. stocks was first disclosed.  Upon information and belief, Plaintiff is subject to no unique defenses not otherwise applicable to the members of the Class.

121.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

122.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable and questions of law or fact common to Class members predominate over any questions affecting only individual members.  Furthermore, because the damages suffered by individual Class members may be relatively small compared to the cost of complex litigation involving international participants, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  Upon information and belief, no member of the proposed Class has maintained litigation concerning the controversy that is the subject of this Action and judicial efficiency is best served by concentrating the litigation of these claims in this forum.

123.    No unusual difficulties are likely to be encountered in the management of this class action.

## CLAIMS FOR RELIEF

### COUNT I
**(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants)**

124.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

125.    During the Class Period, the ACM Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the

investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially

inflate the Net Asset Value of the Funds; and (iii) cause Plaintiff and other members of the Class

to purchase their investments in the Funds at artificially inflated prices.  In furtherance of this

unlawful scheme, plan, and course of conduct, the ACM Defendants took the actions set forth

herein.

      126.    The ACM Defendants:  (i) employed devices, schemes, and artifices to defraud;

(ii) made untrue statements of material fact and/or omitted to state material facts necessary to

make the statements made not misleading; and (iii) engaged in acts, practices, and a course of

business which operated as a fraud and deceit upon the purchasers of interests in the Funds in

violation of Section 10(b) of the Exchange Act and Rule 10b-5.

      127.    The ACM Defendants, directly and indirectly, by the use, means or

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to misrepresent and to not disclose material facts concerning the

investment practices and objectives of the Funds and the manner in which the Net Asset Value of

the Funds was determined as specified herein.  In particular, the ACM Defendants' material

misrepresentations and omissions, which were included in the Offering Memoranda and in other

investment materials disseminated to Plaintiff and the Class for the purpose of inducing their

investments into the Funds, include the following:

      (a)     The ACM Defendants failed to disclose Defendant Homm's relationship with
              Hunter World Markets and with Ficeto;

      (b)     The ACM Defendants failed to disclose that Defendant Homm continuously used
              the assets of the Funds to purchase securities through Hunter World Markets that
              generated huge secret self-dealing profits for Hunter and for Homm;

(c)     The ACM Defendants misrepresented the "Investment Restrictions" that (i) "unlisted securities will be a maximum of 10% of the Net Asset Value of the Fund at the time of making the investment;" and (ii) "no more than 20% of the value of the gross assets (value at the time of making an investment) of the Fund may be exposed to the creditworthiness or solvency of any one counterparty;"

(d)     The ACM Defendants misrepresented that, for purposes of determining Net Asset Value, stocks would be valued "at a fair price" so as to "reflect the fair value" of such investment;

(e)     The ACM Defendants repeatedly and systematically misrepresented the Net Asset Value of the Funds; and

(f)     The ACM Defendants misrepresented the "Investment Objective and Strategy" for the Return Europe Fund and the East West Fund that:  (i) "the Fund currently intends to invest principally in long and short positions in European equities and securities" (Return Europe Fund) and "[t]he Fund intends to focus principally on the old and new European Union members as well as potential EU candidates and their neighbors" (East West Fund).  Moreover, in conjunction with the misrepresentations concerning the "Investment Objective and Strategy" of the Funds, the ACM Defendants misrepresented that the "Investment Objective and Strategy" would "be adhered to for at least three years from the date of listing, other than in exceptional circumstances and then only with the consent of the majority of the Shareholders."

128.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts in the Offering Memoranda and other investment materials as described herein, as set forth above, the values of the investments in the Funds held by Plaintiff and the Class were artificially inflated during the Class Period.  In ignorance of the fraudulent scheme orchestrated by the ACM Defendants and the fact that that scheme caused the values of the assets held by the Funds to be artificially inflated, and relying directly or indirectly on the false and misleading statements made by the ACM Defendants in the Offering Memoranda and other investment materials described herein, Plaintiff and the other members of the Class purchased their interests in the Funds during the Class Period at artificially high prices and were damaged thereby.

129.     At the time of said misrepresentations and omissions contained in the Offering

Memoranda and other investment materials described herein, Plaintiff and other members of the

Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other

members of the Class known of the fraudulent scheme orchestrated by the ACM Defendants and

of the true financial condition of the Funds, Plaintiff and other members of the Class would not

have purchased or otherwise acquired their interests in the Funds, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices

which they paid.

130.     By virtue of the foregoing, the ACM Defendants have violated Section 10(b) of

the Exchange Act, and Rule 10b-5 promulgated thereunder.

131.     As a direct and proximate result of the ACM Defendants' wrongful conduct,

Plaintiff and the other members of the Class suffered damages in connection with their respective

purchases of interests in the Funds during the Class Period.

## COUNT II
### (Violations of Section 20(a) of the Securities
### Exchange Act (15 U.S.C. § 78t) Against Homm, Ewing and Angersbach)

132.     Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

133.     Defendants Homm, Ewing, and Angsbacher are liable as control persons of ACM

pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t.  Defendants Homm and Ewing

were founders, directors, and senior officials of ACM with Defendant Homm serving as ACM's

Chief Investment Officer, and Defendant Ewing serving as ACM's chairman of the board.

Through these positions of virtually unfettered managerial control, Defendants Homm and

Ewing exercised control over Defendant ACM's investments, on behalf of the Funds, in illiquid U.S. penny stocks in violation of the specific trading practices outlined in the Offering Memoranda for the Funds.  Defendant Angsbacher was a director of ACM and, in that position, had access to the investment portfolios of each of the Funds managed by Defendant ACM and knew or should have known of the large concentrations of illiquid U.S. penny stocks acquired by Defendant ACM on behalf of the Funds in violation of the specific trading practices outlined in the Offering Memoranda for the Funds.

134.    But for the deceptive conduct and the misrepresentations and omissions of material facts described above, Plaintiff and the members of the Class would not have invested in the Absolute Capital Funds.  The conduct described above directly caused the losses suffered by Plaintiff and the Class members as a result of the September 2007 disclosure that the deceptive and wrongful trading practices of the ACM Defendants had caused the Absolute Capital Funds to lose hundreds of millions of dollars through their wrongful investment in U.S. penny stocks which, in turn, had been wrongfully concealed from Plaintiff and the Class members by the ACM Defendants' knowing use of deceptive and inflated Net Asset Values of the Funds and communicating those inflated Net Asset Values to Plaintiff and the Class.

## COUNT III
### (Successor Liability of Argo Group Limited)

135.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

136.    The Argo Spinoff resulted in a new entity, Argo Group Limited, that was merely a continuation of the debt and real estate fund business of ACM.  The same persons responsible for ACM's debt and real estate fund management before the Argo Spinoff continued to manage the

debt and real estate funds after the Spinoff, for the benefit of the exact same shareholders of ACM who had become shareholders of Argo Group.  Accordingly, Argo Group Limited is liable as the successor to ACM.

137.    Argo Group Limited is the product of a de facto merger of ACM and Argo Group Limited and thus liable as the successor to ACM

138.    The Argo Spinoff was a fraudulent transfer of ACM's most valuable assets to shield those assets from ACM's liability for fraud based upon the fraudulent penny stock investment scheme described herein.  Thus Argo Group Limited is liable as the successor to ACM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiff as the Class Representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against the Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

C.    Enforcing judgment against the ACM Defendants and imposing successor liability upon Argo Group by executing upon the assets of ACM that were transferred to Argo Group, including but not limited to ACM's stock in Argo Capital Management and related Argo entities;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.      Directing that the clerk enter judgment on behalf of Plaintiff and the Class in accordance with the relief requested herein; and

F.      Such other and further relief as the Court may deem just and proper.

### Demand For Trial By Jury

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:  May 17, 2010.

Respectfully submitted,

**SANDER INGEBRETSEN & WAKE, P.C.**

*Original signature on file*

By: s/Daniel F. Wake
    1660 17th Street, Suite 450
    Denver, CO  80202
    Telephone:  303-285-5544
    Facsimile:  303-285-5301
    dwake@siwlegal.com

    George W. Croner
    **KOHN, SWIFT & GRAF, P.C.**
    One South Broad Street, Suite 2100
    Philadelphia, PA 19107
    Telephone:  215-238-1700
    Facsimile:  215-238-1968
    gcroner@kohnswift.com

**Plaintiff's Address:**
The Cascade Fund, L.L.L.P.
32065 Castle Court, Suite 100
Evergreen, CO  80439