IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-01381-MSK-CBS

THE CASCADE FUND, LLLP, on behalf of itself and a class of similarly situated persons,

      Plaintiff,

v.

ABSOLUTE CAPITAL MANAGEMENT HOLDINGS LIMITED,
FLORIAN HOMM,
SEAN EWING,
ULLRICH ANGERSBACH, and
ARGO CAPITAL MANAGEMENT LIMITED,

      Defendants.

---

## OPINION AND ORDER GRANTING MOTIONS TO DISMISS

---

**THIS MATTER** comes before the Court on Defendant Absolute Capital Management Holdings Limited's ("ACM") Motion to Dismiss (**#110**), Plaintiff The Cascade Fund, LLP's ("Cascade") response (**#117**), and ACM's reply (**#123**); and Defendant Argo Capital Management Limited's ("Argo's") Motion to Dismiss (**#111**), Cascade's response (**#116**), and Argo's reply (**#124**). Having considered the same, the Second Amended Complaint (**#104**), and the relevant law, the Court **FINDS** and **CONCLUDES** the following.

### I.   Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### II.   Issue Presented

In this case, Cascade asserts a single claim against ACM and Argo for violations of §10(b) of the Securities Exchange Act of 1934, and Rule 10b-5, promulgated thereunder.  The claim against ACM is for actual violations of the Exchange Act; the claim against Argo is based on successor liability as the purchaser of all of ACM's assets.

### III.   Material Facts

ACM manages and sells shares in a number of investment funds, each of which are organized under the laws of the Cayman Islands. All of the Funds are listed on foreign securities exchanges; none are listed on any American stock exchange.  Defendants Florian Homm, Sean Ewing, and Ullrich Angersbach are directors of ACM, engaged in managing the funds and soliciting investments therein.

Using various methods of interstate communications, ACM solicited Cascade, an entity formed and operated in the United States, to invest in ACM's funds.  Among other things, ACM distributed a written Offering Memoranda and "other fund investment materials" to Cascade. Among other things, the investment materials identified ACM's investment team, described the Funds' objectives, and contained certain due diligence reports.  Investment representatives of ACM periodically traveled to the United States to meet with investors, although it is not alleged that any investment representative met with Cascade.

Beginning in January 2005, Cascade made several investments in various ACM funds. The record seems to suggest that the mechanism by which an investment was made varied based on the fund invested in, but the record here only describes one such mechanism in any detail and the Court will assume that mechanism applied universally.  The investment was initiated by Cascade executing a Subscription Agreement and sending it to ACM in the Cayman Islands for

2

acceptance.  To tender funds in conjunction with the Subscription Agreement, the investor would wire funds to ACM via banks in New York (if the investment was to be made using dollars) or banks in Europe (if the investment was made using Euros).[1]  The Subscription Agreement included an acknowledgment that ACM had the right to reject an application for investment in any fund for any reason.

In September 2007, Mr. Homm suddenly and unexpected resigned from ACM.  In conjunction with Mr. Homm's departure, ACM released certain information regarding the funds' investments and performance.  Of particular significance, ACM notified investors that significant portions of some funds' assets – 15-40% in some circumstances – had been invested in unregulated "penny stocks," which Cascade describes as being illiquid, thinly-traded, speculative, and far more risky than more conventionally-regulated securities.[2]  Cascade alleges that these large investments in penny stocks were contrary to the investment strategy described in ACM's prospectuses and other offering materials for the funds.  Upon the disclosure of the penny stock investments (and evidence that those stocks had been grossly overvalued by ACM), the funds' share prices were significantly reduced, resulting in a devaluation of Cascade's investments.

Cascade initiated this action against ACM, the individual corporate directors and officers

---

[1]The record does not reflect what became of the funds once dispatched to banks in New York or Europe.  The most reasonable inference is that, if the application for investment was accepted, ACM would direct that those funds be forwarded to the appropriate fund manager; if the application was rejected, ACM would direct that those funds be returned to the investor.

[2]Cascade alleges that ACM's investment in these penny stocks was done in order to enrich Mr. Homm, who stood to profit in various ways from ACM's purchase of those penny stocks.

of ACM, and Argo, to whom ACM subsequently transferred all of its assets.  Cascade asserts a

single claim against ACM and Argo: securities fraud under section 10(b) and Rule 10b-5 of the

Exchange Act of 1934.  Cascade contends that ACM failed to disclose material facts that caused

certain statements in its Offering Memoranda to be materially misleading, including facts

relating to Mr. Homm's financial conflicts of interest and the funds' failure to adhere to their

stated investment strategies.

## IV.   Standard of Review

ACM and Argo move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for failure to

state a claim upon which relief can be granted.  There is a strong presumption against dismissal

for failure to state a claim under Rule 12(b)(6).  *See Cottrell, Ltd. v. Biotrol Int'l, Inc.,* 191 F.3d

1248, 1251 (10th Cir. 1999).  However, a claim must be dismissed if the complaint does not

contain enough facts to make the claim "plausible on its face."  *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  A claim is plausible on its face if the complaint contains sufficient

facts for a court to draw an inference that the defendant is liable for the alleged misconduct.  *See*

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *id.* at 556).  Although a plaintiff is not

required to include detailed factual allegations in a complaint, the complaint must contain "more

than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" and

must "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  In

reviewing a complaint under Rule 12(b)(6), a court should accept, as true, all well-pleaded facts

and construe all reasonable allegations in the light most favorable to a plaintiff.  *Smith v. United*

*States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

In addition, because Cascade is asserting claims of securities fraud, it must also comply

with the heightened pleading standard required by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003) (citing 15 U.S.C. § 78u-4(b)(2)).  In the case of material omissions, the required state of mind is intent to defraud or recklessness. *See City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260–62 (10th Cir. 2001).

Additionally, when the securities violation is premised upon misleading statements or omissions, a plaintiff must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.  *See* 15 U.S.C. § 78u-4(b)(1).

## V.   Analysis

### A.      ACM's Motion to Dismiss

The scope of § 10(b) is coextensive with the scope of Rule 10(b)(5).  *See SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002).  Section 10(b) makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
> . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*See* 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated under § 10(b), makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange
> (a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances un der which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) or Rule 10b-5,[3] a plaintiff must show that the securities transaction at issue was a securities transaction that is covered by the Exchange Act. *See Morrison v. Nat'l Austl. Bank Ltd.*, 130 S.Ct. 2869, 2884 (2010). If the plaintiff meets this threshold inquiry, he or she must allege facts establishing that (i) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (ii) the misleading statement was made in connection with the purchase or sale of securities; (iii) the defendant acted with scienter, *i.e.*, with intent to defraud or recklessness; (iv) the plaintiff relied on the misleading statements; (v) the plaintiff suffered damages as a result of his reliance; and (vi) the misleading statements were made by virtue of the requisite jurisdictional means. *See Dura Pharms., Inc.*, 544 U.S. at 341; *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008); *Adams v. Kinder-Morgan, Inc*., 340 F.3d 1083, 1095 (10th Cir. 2003).

In its Motion to Dismiss, ACM challenges the sufficiency of Cascade's allegations that (i) the transactions at issue are covered by the provisions of the Exchange Act; (ii) ACM made any untrue or misleading statement or omission; (iii) ACM made such statements in connection with Cascade's purchase or sale of securities; (iv) ACM acted with the requisite scienter; and (v)

---

[3] The elements of a claim under either provision are identical. *See Dura Pharms., Inc. v. Bruoudo*, 544 U.S. 336, 341 (2005); *SEC v. Maxxon*, 465 F.3d 1174, 1179 (10th Cir. 2006).

Cascade relied on misleading statements.  Given the Court's determination of ACM's first argument, explained *infra*, analysis of the remaining arguments is not necessary.

ACM's argument that the transactions at issue here are not covered by the Exchange Act is premised on the Supreme Court's recent decision in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S.Ct. 2869 (2010).  In *Morrison*, Australian investors sued the Australian bank in which they had invested.  The bank had purchased a mortgage servicing company in Florida, on the belief that the mortgage servicing business would generate significant profits for the bank.  In reality, the mortgage servicing company was overvalued, leading the Australian bank to declare a substantial business loss. The plaintiff investors sued the bank in federal court in the United States, asserting claims of securities fraud under § 10(b).  The District Court dismissed the action for lack of subject matter jurisdiction, insofar as the defrauding of the Australian investors in Australia had no connection to the United States.  The Second Circuit affirmed, and the Supreme Court granted certiorari to determine whether § 10(b) applied to foreign investments of this type. the transactions at issue.[4]

The Court in *Morrison* began with the presumption that, unless a contrary intent appears in a statute, legislation is meant to apply only within the territorial jurisdiction of the United States. 130 S.Ct. at 2877.  The Court recognized a body of case law that had developed within the Second Circuit did not adhere to this presumption, instead determining the extraterritorial application of § 10(b) based on case-by-case consideration of whether Congress intended the statute to apply to the particular circumstances.  In particular, the Second Circuit applied

---

[4]  The Court clarified that this was not a jurisdictional determination, but a determination as to the application of § 10(b).

analyses designated as the "effects test" and "conduct test."  Under the "effects test" § 10(b) applied if the wrongful conduct had a substantial effect in the United States or on United States citizens.  Under the "conduct test" the applicability of § 10(b) was premised on whether the wrongful conduct occurred in the United States.  *Citing SEC v. Barger*, 322 F.3d 187, 192–93 (2d Cir. 2003); *see also Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968); *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972).  The Supreme Court rejected both of these tests, finding that they ignored the long-standing presumption against extraterritoriality, and that they were unnecessarily complex, unpredictable, and difficult to apply consistently.  130 S.Ct. at 2880–81.

The Supreme Court determined that, pursuant to the presumption against extraterritoriality (and the lack of statutory language evidencing an intent to override that presumption), § 10(b) did not apply outside the territorial jurisdiction of the United States.  130 S.Ct. at 2883.  This determination did not end the Court's inquiry, however.  The plaintiffs argued that the circumstances of their case did not call for extraterritorial application of § 10(b) as the deceptive practices at issue involved misrepresentations regarding the value of the Florida mortgage servicing business, and thus, the fraudulent statements at issue occurred domestically in Florida.  The Court found this contention unavailing.  It noted that "it is the rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States," and that the "presumption against exterritorial application would be craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Id.* at 22484-86.  The Court then attempted to set forth an approach for assessing when fraud claims arose domestically and when they arose extraterritorially.

Mirroring the congressional "focus" of the Exchange Act, the Court focused on the purchase and sale transactions that the Act sought to regulate and the parties the Act was intended to protect. Because the Exchange Act was not intended to regulate foreign security exchanges and Congress had no authority to regulate such transactions, the Court concluded that § 10(b) applies only to "transactions in securities listed on domestic exchanges and domestic transactions in other securities." As to the second category—"domestic transactions in other securities"—the Court stressed that it was the location of the *transaction* that determined whether the matter was subject to § 10(b). Thus, *Morrison* rejects tests that focus on the locus of the fraud or the effects that it has on domestic investors and instead sets forth a "transactional test" that determines the scope of § 10(b): "whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange."

Here, ACM contends that *Morrison* precludes application of § 10(b) to the claims by Cascade, because the funds are not traded on any domestic stock exchange and because the transaction here occurred in the Cayman Islands, not the United States. In response, Cascade both disputes the import of *Morrison* and argues that its purchases of shares in the Funds constitute domestic transactions.

The Court turns first to Cascade's arguments regarding the significance of *Morrison*. Cascade argues that because it is a U.S. investor and has sued solely on behalf of itself and other U.S. investors, its purchases of shares of the Funds are covered by § 10(b). This argument urges that this Court apply the very "effects test" from the Second Circuit that *Morrison* repudiated. *Morrison* makes clear that the test of § 10(b)'s reach is not dependent on the fact that domestic investors in foreign securities were harmed by fraud.

Second, Cascade argues that the holding of *Morrison* should be limited to its specific facts. In particular, Cascade argues that *Morrison's* limitation on the scope of § 10(b) applies only to so-called "f-cubed transactions"—those transactions in which foreign investors purchase foreign stocks on foreign securities exchanges. (Under this conception, Cascade's claims would be "f-squared transactions" in that it was a domestic investor buying foreign stocks on foreign exchanges.)  It is fair to say that this is the particular factual circumstance presented in *Morrison*, but the Supreme Court's analysis takes no account of the residence of the investor. Indeed, this is simply a restatement of the prior argument invoking the discredited "effects test," as harm to a domestic investor is going to be felt domestically.  Nothing in the reasoning of *Morrison* suggests that the Supreme Court intended its analysis to be limited to the peculiar facts of that case; indeed, by rejecting prior tests and articulated a wholly new analysis for extraterritoriality determinations, it is clear that *Morrison* intended its reach to extend far beyond the particular facts of that case.  To limit *Morrison* to its specific facts would be to ignore the Court's extensive discussion and reasoning as well as the Court's determination as to limited scope of the Act,        Moreover, Cascade's contention that lower courts have limited *Morrison* to f-cubed transactions is not supported by the four cases it cites. Two of the cases conclude, unremarkably, that the f-cubed transactions at issue are indeed beyond the reach of § 10(b). *See Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 2010 WL 3119908, at *3 (S.D. Fla. Aug. 6, 2010) (unpublished) (holding that under *Morrison* a purchase by a foreign investor of foreign stock was not a domestic transaction simply because the parties designated the closing to take place at one party's law offices in Florida); *In re Banco Santander Secs.- Optimal Litig.*, 2010 WL 3036990, at *5–6 (S.D. Fla. July 30, 2010) (unpublished) (holding that

10

under *Morrison* a foreign investor's investment in foreign investment funds, even if these funds

thereafter invested in American companies, were not a domestic transaction subject to federal

securities laws).  As a consequence, the courts did not address the argument that Cascade urges

here.

The third case cited by Cascade expressly rejects the argument Cascade presents.  *See*

*Cornwell v. Credit Suisse Group*, 2010 WL 3069597, at *5–6 (S.D. N.Y. July 27, 2010)

(unpublished).  Indeed, the court states:

> A careful reading of *Morrison* evinces that the majority reached beyond the four
> corners of the case before it and went out of its way to fashion a new rule
> designed to correct the enumerated flaws the Court found in the Second Circuit's
> tests, while also fully aware of its far broader implications . . .
>
> In fact, read as a whole, the *Morrison* opinions indicate that the Court
> considered that under its new test § 10(b) would not extend to foreign securities
> trades executed on foreign exchanges <u>even if purchased or sold by American
> investors</u>, and even if <u>some aspects of the transaction occurred in the United
> States</u>. . . .
>
> Moreover, the Supreme Court also signaled that the geographic exception
> which Plaintiffs seek to carve here for foreign transactions on the basis of the
> occurrence of some activities or contacts in the United States would not satisfy
> the new rule.

*Id.* (emphasis added).

Only Cascade's final case, *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409 (C.D.

Cal. July 16, 2010), arguably supports Cascade's position.  In *Stackhouse*, the court sought to

explain the meaning of *Morrison*:

> One view of the Supreme Court's holding is that if the purchaser or seller resides
> in the United States and completes a transaction on a foreign exchange from the
> United States, the purchase or sale has taken place in the United States. However,
> an alternative view is that because the actual transaction takes place on the
> foreign exchange, the purchaser or seller has figuratively traveled to that foreign
> exchange-presumably via a foreign broker-to complete the transaction.  Under
> this second view, 'domestic transactions' or 'purchase[s] or sale[s] ... in the
> United States' means purchases and sales of securities explicitly solicited by the

issuer within the United States rather than transactions in foreign-traded securities where the ultimate purchaser or seller has physically remained in the United States.

The final sentence of *Stackhouse* appears to read *Morrison* for the proposition that a domestic investor's purchase of foreign stocks on foreign exchanges are nevertheless "domestic transactions" subject to § 10(b) if the issuer solicited the investments in the United States. This Court finds *Stackhouse* unpersuasive for several reasons. First, it offers no explanation as to how it reads *Morrison* to reach the conclusion that a "domestic transaction" is defined by the locus of solicitation, particularly where *Morrison* makes no mention whatsoever of the significance of the place of solicitation. *Stackhouse* is also unpersuasive given its context. The decision appears to involve the designation of a lead plaintiff in a class action, and it is not clear from *Stackhouse* why the court felt obligated to address this particular issue in *Morrison* or what facts in *Stackhouse* related to that issue.[5] *Stackhouse* itself seems to recognize that its ruling is *dicta*, as the court explains that "this is not a final determination of the issue."[6] As a result, although *Stackhouse* might be read to support Cascade's argument here, this Court finds *Stackhouse*'s interpretation of *Morrison*'s "domestic transactions" test to be unpersuasive.

Rather, this Court follows the plain language of *Morrison*: claims under § 10(b) are cognizable only when they involve "a security listed on a domestic exchange" or where "th

---

[5]This Court can only assume that some foreign investors in Toyota were seeking appointment as lead plaintiff, but were prevented from asserting claims (and thus serving as lead plaintiffs) by *Morrison*. But *Stackhouse* does not describe the circumstances of these foreign investors, making it impossible to ascertain the true thrust of the court's findings.

[6]*Stackhouse* is rendered even more confusing by a statement that seems to suggest that it was tentatively concluding that "domestic purchasers of Toyota common stock" do not have cognizable § 10(b) claims, as "a fair reading if *Morrison* excludes those claims." (Emphasis added).

purchase or sale [of the security] is made in the United States."  It is undisputed that the funds here were not traded on United States stock exchanges, and thus, Cascade is left to argue that its purchase of shares in the funds were "made in the United States."

Cascade points to four facts that it contends are sufficient to demonstrate that its investment was a domestic transaction: (i) the Offering Memoranda and other investment materials were disseminated to Cascade in the United States; (ii) Mr. Homm and other ACM executives traveled to the United States to solicit American investors; (iii) Cascade made its decision to invest while in the United States; and (iv) the money for the purchase was wired to a bank in New York.  This Court finds each of these facts to be insufficient to deem to locus of the transaction to be the United States.

*Morrison* expressly rejected both the Second Circuit's "conduct test" – which extended coverage of § 10(b) based on "whether the wrongful conduct [that is, the fraudulent statements – *i.e.* those in the Offering Memorandum upon which Cascade allegedly relied] occurred in the United States" – and a test proposed by the Solicitor General that located the fraud in the United states if it "involved significant conduct in the United States."  130 S.Ct. at 2886.  This rationale strongly suggests that inquiry into the location of solicitation is irrelevant to the inquiry.  *Id.* at 2884 ("the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States").  *Morrison* is explicit that the reach of § 10(b) is determined by the location of the "transaction," not events preparatory to that transaction.  Thus, Cascade's proffer of facts showing the locus of solicitation is insufficient.

That leaves the final fact urged by Cascade: that the funds to complete the transaction were wired (at least initially) to New York.  This assertion does not amount to a conclusion that

the transaction was completed in New York; rather, it simply describes one step by Cascade to comply with ACM's designated process for applying to invest in the funds.  The Subscription Agreement makes clear that simply sending money to New York was not sufficient to complete the transaction.  ACM reserved the right to reject a request to invest for any reason, even if the purchase money had properly been wired to New York.  Thus, the transaction was not completed until ACM finally accepted an application – presumably in its Cayman Islands offices.  Under these circumstances, the Court cannot say that the facts alleged by Cascade indicate that the transaction occurred in the United States.  Accordingly, Cascade has failed to allege facts showing that a § 10(b) claim is cognizable here, and ACM is entitled to dismissal of the claim against it.

**B.    Argo's Motion to Dismiss**

Argo has filed a Motion to Dismiss **(#111)** arguing that the failure of the Second Amended Complaint to assert a claim against ACM must also result in the dismissal of the claims against it.  Argo also challenges the Court's exercise of personal jurisdiction over it and the sufficiency of the Second Amended Complaint's allegations of successor liability against it. The Court only need consider Argo's first argument.  As Cascade's claim against Argo is premised solely on its position as a successor to ACM, *i.e.*, that as a successor it is liable for the fraud allegedly perpetrated by ACM, the dismissal of the claim against ACM must also result in the dismissal of the claim against Argo.

**C.    Leave to replead**

As a general rule, the Court should not dismiss claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6) if the defect is capable of being remedied by repleading.   Leave to

replead should only be denied where the Court finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." *Beerheide v. Zavaras*, 997 F.Supp. 1405, 1409 (D. Colo. 1998), *citing Foman v. Davis*, 371 U.S. 178, 182 (1962).  An amendment can be denied on the grounds of futility if the amended pleading itself would be subject to dismissal.  *Jefferson County School Dist. v. Moody's Investor Services, Inc*., 175 F.3d 848, 859 (10th Cir. 1999); *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir.1999).

ACM requests that the claims be dismissed with prejudice because this is Cascade's third attempt at asserting claims against ACM.  Although this is true, the Court observes that all of Cascade's prior pleadings were drafted prior to the Supreme Court's decision in *Morrison*. That case dramatically modified the contours of the claim Cascade has to plead, and it would be unduly prejudicial to Cascade to deny it an opportunity to replead its complaint to satisfy the requirements of *Morrison*. ACM does not identify any particular prejudice that it will suffer if leave to replead is granted.  Accordingly, the Court will grant Cascade 30 days in which to file an amended pleading that states facts sufficient to bring this claim within *Morrison*.

**IT IS THEREFORE ORDERED** that

(1)     Defendant Absolute Capital Management Holdings Limited's ("ACM") Motion to Dismiss **(#110)** is **GRANTED**.

(2)     Defendant Argo Capital Management Limited's ("Argo") Motion to Dismiss **(#111)** is **GRANTED**.

(3)     The claims against Absolute Capital Management Holdings Limited and Argo Capital Management Limited are **DISMISSED**.

(4)     The effect of this Order is **STAYED** for 30 days, during which Cascade may file an amended pleading that states a cognizable claim.  Should Cascade be unwilling or unable to file such an amended pleading, the dismissal of all claims in this case shall take effect without further order of the Court.

Dated this 31st day of March, 2011

BY THE COURT:

Marcia S. Krieger
United States District Judge

16